UNITED STATES, Appellant,

v.

Marvin L. EDWARDS, Appellee.

Marvin L. EDWARDS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 80–294, 80–401.

District of Columbia Court of Appeals.

Argued En Banc May 27, 1980.

Decided May 8, 1981.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Carl S. Rauh, John A. Terry, and Michael S. Pasano, Asst. U. S. Attys., Washington, D. C., were on the motion, for appellant in No. 80–294 and appellee in No. 80–401.

Stephen H. Glickman and James H. McComas, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Mady Gilson, W. Anthony Fitch, and Mary Lou Soller, Public Defender Service, Washington, D. C., were on the motion, for appellee in No. 80–294 and appellant in No. 80–401.

William A. McDaniel, Jr. and Keven T. Baine, Washington, D. C., with whom John B. Kuhns, Washington, D. C., was on the motion, for The Washington Post as amicus curiae.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER,* NEBEKER, HARRIS, MACK, FERREN and PRYOR, Associate Judges.

NEWMAN, Chief Judge:

These consolidated appeals present us, for the first time, with the question of the constitutionality of the District of Columbia pretrial detention statute, D.C.Code 1973, § 23–1322, under which a suspect arrested for certain enumerated offenses may be detained for up to 60 days pending trial. In the first case, No. 80–294, the government appeals the ruling of Judge Bowers which denied pretrial detention for Marvin Edwards when the government refused to present the complaining witness for cross-examination. In the second case, No. 80–401, Marvin Edwards appeals Judge Norman's subsequent ruling granting the government's motion that he be detained. Appellant Edwards[1] challenges the proceeding as violative of his asserted constitutional right to bail, his right to a fair trial, and his right to due process, including

---

* Judge Gallagher was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.

1. For convenience, Mr. Edwards is hereinafter referred to as "appellant", although he is the appellee in No. 80–294.

rights of confrontation, cross-examination, and compulsory process. In addition, the government challenges the constitutionality of the partial closure of both proceedings. We find the pretrial detention statute constitutional as applied to appellant and hold the closure of the hearings improper under the First Amendment.[2]

## I. FACTS

Marvin Edwards was arrested on March 18, 1980, and charged with the armed rape of a woman in the early morning hours of February 23, 1980. Fingerprints matching appellant's had been found at the scene, and appellant was arrested on the basis of this information. At the time of his arrest, appellant confessed both to the rape and to a forcible sodomy on another person several months before, as well as to seventeen additional robberies. A ring stolen during the course of the rape was recovered from a pawnshop where it had been pawned in appellant's name. The rape victim identified appellant at a line-up as her assailant. On the basis of this information, and on appellant's extensive juvenile record, the government moved for appellant's pretrial detention pursuant to D.C.Code 1973, § 23–1322(a)(1), at appellant's presentment.

A hearing on the motion was set for March 25, 1980, before Judge Bowers, and continued to March 28 at appellant's request. Appellant requested the continuance in order to exercise his right to subpoena witnesses. Appellant also requested of the government any information concerning both the rape charge and any "past

and present" conduct upon which the government intended to rely to show a pattern of dangerous behavior. The government declined these requests. Appellant, prior to the March 28 hearing, moved that the hearing be closed in order to protect his right to a fair trial. The government initially took no position on closure, but subsequently objected. Appellant made no proffer as to specific prejudice from articles already published, and presented no evidence that future publicity was likely. The court ordered the courtroom closed without any specific findings that closure was necessary to protect appellant's fair trial rights.[3]

Appellant also raised Fifth and Eighth Amendment challenges to the detention proceeding, contending that the Constitution requires a right of confrontation and of cross-examination which precludes the use of proffers or hearsay. The court agreed and ruled that hearsay would be inadmissible, and to the extent D.C.Code 1973, § 23–1322 authorized the use of proffers or hearsay, it was unconstitutional. Appellant further contended that he had a right under *Blunt v. United States*, D.C.App., 322 A.2d 579 (1974), to have certain material witnesses, including the rape complainant, available for cross-examination. Appellant's counsel represented that he could not subpoena the complainant because he did not know her whereabouts. The court held that appellant had a right to cross-examine the complainant without proffering how her testimony might be exculpatory, and denied the motion for pretrial detention when the government declined to present

---

**2.** Subsequent to argument on appeal, appellant entered pleas of guilty in both cases in which pretrial detention was sought pursuant to plea bargains. The disposition of the charges raises a question of mootness, as appellant is no longer held under the statute he challenges. We conclude, however, that the inherently limited time period for pretrial detention renders confinement under the statute a practice that would be "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see Gerstein v. Pugh*, 420 U.S. 103, 110 n.11, 95 S.Ct. 854, 861 n.11, 43 L.Ed.2d 54 (1975); *District of Columbia v. Washington Home Ownership Council, Inc.*, D.C.App., 415

A.2d 1349, 1350 n.3 (1980) (challenge to 90-day emergency acts not moot). Similarly, although the closure orders may no longer be in effect, they also fall within the "capable of repetition, yet evading review" category. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563, 100 S.Ct. 2814, 2820–21, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale*, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979).

**3.** The court also ordered that the record be sealed for all purposes except appellate review, the order presumably to be effective until trial or disposition of the charges. Notwithstanding this order, the record comes to us unsealed.

her as a witness. The government filed an appeal, No. 80–294, pursuant to D.C.Code 1973, § 23–1324(d)(2).

On April 1, 1980, appellant was charged with burglary, robbery, and sodomy arising out of a single incident on November 23, 1979, to which appellant had confessed after his arrest on the charge of rape. At his presentment on the new charges on April 1, before Judge Norman, the government again moved for detention under D.C.Code 1973, § 23–1322(a)(1). Appellant requested and received a continuance until April 4. As in the prior proceeding, appellant's counsel requested notice and discovery of the government, which was largely denied. The government did provide copies of appellant's confession before the start of the hearing on April 4. At the outset of the hearing, appellant again requested closure and the government objected. Judge Norman initially ruled in favor of complete closure. The court ruled that appellant could make a voluntary and knowing waiver of his personal Sixth Amendment right to a public trial unless the government could show a compelling interest in having an open hearing. Later, after hearing from counsel for amicus, the Washington Post, the court modified its ruling so as to exclude the press and public only during the presentation of evidence that would be inadmissible at a subsequent trial.

Appellant also renewed his constitutional objections to the pretrial detention hearing as provided for by statute. The court ruled against the appellant in each instance except one. The court construed the statute to require the government to establish by a substantial probability, without resort to hearsay, that the accused committed the charged offense. The court ruled, however, that it would admit hearsay regarding appellant's past and present conduct to show dangerousness to the community. Accordingly, the court excluded hearsay testimony regarding the complainant's line-up identification of appellant and of her report to the police of the assault. The court further ruled that because the complainant was not relied upon by the government as a witness, appellant was not entitled to compel her presence for cross-examination, and could not call her on his own behalf without a proffer that her testimony would tend to negate a "substantial probability" showing of complicity.

On the basis of the evidence presented, Judge Norman granted the motion for detention. Appellant thereupon noted an appeal, No. 80–401. The two appeals were consolidated for argument en banc before this court.

## II. CONSTITUTIONAL RIGHT TO BAIL

■ Appellant attacks the constitutionality of the pretrial detention statute on its face as contrary to an asserted constitutional right to bail. The source for this asserted right is the "excessive bail" clause of the Eighth Amendment.[4] Whether this clause grants a right to bail in a criminal case has never been decided in the federal courts.[5] Before the adoption of the pretrial detention statute, Congress had always provided

---

4. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.Const. Amend. VIII.

5. See Bell v. Wolfish, 441 U.S. 520, 534 n.15, 99 S.Ct. 1861, 1871 n.15, 60 L.Ed.2d 447 (1979) (reserving the question whether any governmental interest besides guaranteeing an accused's presence at trial may justify pretrial detention). The contradictory dicta of Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951), and Carlson v. Landon, 342 U.S. 524, 545, 72 S.Ct. 525, 536, 96 L.Ed. 547 (1952), are inconclusive on the issue. See discussion infra Part II (D).

Previous cases in this jurisdiction have not directly passed on this question. In Blunt v. United States, 322 A.2d at 583–84, we upheld the constitutionality of D.C.Code 1973, § 23–1322(a)(3) (detention to prevent obstruction of justice and threatening of witnesses) but did not pass on the constitutionality of detention under D.C.Code 1973, § 23–1322(a)(1) or (2). In Dash v. Mitchell, 356 F.Supp. 1292 (D.D.C. 1972) (three-judge court), the District Court held the plaintiffs had no standing to question the constitutionality of the pretrial detention statute. See generally United States v. Alston, D.C.App., 412 A.2d 351, 358 n.15 (1980) (en banc).

a statutory right to pretrial bail for federal detainees in noncapital cases.[6] Appellant concedes that the literal language of the excessive bail clause does not encompass a right to bail, but would have us find such a right implied in the clause on the basis of the history of the adoption of the clause and its constitutional context. The history of the Eighth Amendment, however, is generally unilluminating and falls short of supporting, let alone compelling, the conclusion that a right to bail must be found by implication.

### A. History of English Bail

The excessive bail clause of the Eighth Amendment was adopted almost verbatim from section nine of the Virginia Declaration of Rights of 1776,[7] which in turn was derived from the English Bill of Rights of 1689.[8] The excessive bail clause of the English Bill of Rights itself sought to close a loophole in the English bail system by restricting the discretion of local justices in setting bail for offenses otherwise deemed bailable. The limited nature of the excessive bail clause in its original form becomes apparent upon an examination of the evolution of the English bail system. See Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb.L.Rev. 33, 34–66 (1977); Foote, *The Coming Constitutional Crisis in Bail* (pt. 1), 113 U.Pa.L.Rev. 959, 967–68, 982–83 (1965); Meyer, *Constitutionality of Pretrial Detention* (pt. 1), 60 Geo.L.J. 1139, 1151–56, 1180–90 (1972).[9]

The English bail system developed out of the ancient Anglo-Saxon forms of sureties into early common law bail. By the thirteenth century the local representative of the Crown, the sheriff, exercised a broad and ill-defined discretionary power to bail the King's prisoners committed to his custody. This power was widely abused by sheriffs who extorted money from individuals entitled to release without charge and who accepted bribes from those who were not otherwise entitled to bail. The first statutory regulation of bail, the Statute of Westminster I, 3 Edw. 1, c. 15 (1275), sought to curb such abuses by carefully enumerating which offenses were bailable and which were not. The sheriffs, and later the justices of the peace, were required to grant or deny bail according to the terms of the statute, which also provided sanctions for noncompliance. The statute, however, did not bind the higher justices nor the King

---

6. "From the passage of the Judiciary Act of 1789, ... to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail." *Stack v. Boyle*, 342 U.S. at 4, 72 S.Ct. at 3 (emphasis in original). See 18 U.S.C. § 3146 (1976) (right to bail in noncapital cases); Fed. R.Crim.P. 46(a) (incorporating § 3146 by reference).

 The government contends that the longstanding and well-established exception for capital crimes in both the federal bail statute and under most state constitutions justifies a denial of bail in *non* capital cases on the grounds of the detainee's dangerousness, citing Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 Va.L.Rev. 1223, 1225–31 (1969). Despite its superficial plausibility, however, there is no historical support for equating the capital crimes exception with a finding of dangerousness; rather, the right to bail was denied for capital crimes on the theory that a person faced with a possible death penalty would be likely not to appear at trial, so bail was denied to prevent flight, not to protect the community. See Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 Va.L.Rev. 371, 377–79, 397, 400–02 (1970).

7. "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," *reprinted in* 10 Sources and Documents of United States Constitutions 49 (W. Swindler ed. 1979); 7 American Charters 3813 (F. Thorpe ed. 1909). *Compare* note 4 *supra*.

8. 1 W. & M., c. 36, § I(10) (1689) ("That excessive bail ought not to be required ....").

9. In *Carlson v. Landon*, 342 U.S. at 544–46, 72 S.Ct. at 536–37, the Court, in dictum, stated that the Eighth Amendment's excessive bail clause does not provide a right to bail, citing, without discussion, its derivation from the English Bill of Rights. Commentators have criticized the Court's summary discussions as historically inaccurate, asserting that it relies on an apparent misunderstanding of the allocation of discretion to the justices of the King's Bench to grant bail for crimes made nonbailable by statute. *See, e. g.*, Foote, *The Coming Constitutional Crisis in Bail* (pt. 1), 113 U.Pa.L.Rev. at 979.

himself, and Parliament was free to redefine which crimes were bailable. *See* Duker, *supra* at 43–50; Meyer, *supra* at 1151–57.

Further limitations on the discretion to grant bail were enacted to cure defects in the law which the Stuarts exploited to deny release to particular prisoners. The Petition of Right of 1628, in which King Charles I acquiesced, required that, upon petition, a return be made showing the specific cause upon which a prisoner was being detained.[10] A specific return, rather than a general recitation that the prisoner was detained at the King's command, would enable a justice to determine whether the cause was a bailable offense, as determined by statute or common law, as well as allow for an answer and a trial on the charge. Procedural abuses by the Stuarts after the Restoration led to the enactment fifty years later of the Habeas Corpus Act of 1679, which closed the procedural loopholes by firmly establishing a means for enforcing the rights of bail and habeas corpus.[11] When, thereafter, the protections of the Habeas Corpus Act were circumvented by the practice of setting prohibitively high bail, the excessive bail clause was drafted into the Bill of Rights of 1689, clause 10, in order to correct this injustice. *See* Duker, *supra* note 10, at 66; Foote, *supra* note 9, at 967–68; Meyer, *supra* note 10, at 1189–90. In sum, the excessive bail clause was developed as a specific remedy for judicial abuse of the bail procedure as otherwise established by law, and did not, in and of itself, imply any right to bail.

### B. Colonial and State Constitutional Bail Rights

Appellant contends that, notwithstanding the narrow language and limited purpose of the excessive bail clause in the seventeenth and eighteenth centuries, the practice in the colonies established the right to bail as a "fundamental right" which perforce was implicitly guaranteed by the Eighth Amendment. This argument is not supported by history. First, a fundamental right to bail was not universal among the colonies or among the early states; several states made the right to bail a statutory rather than a constitutional right. *See* Duker, *supra* note 10, at 77–83; Meyer, *supra* note 10, at 1191. Second, the language of several state constitutions explicitly limiting the power of the judiciary to set excessive bail negates any suggestion that the excessive bail clause was intended to restrict the definition of bailable offenses by the legislature. *See* Duker, *supra* note 10, at 81–83. Third, the early state constitutions that specifically granted a right to bail also contained an excessive bail clause, suggesting a recognition of the distinction between the two. *See* Meyer, *supra* note 10, at 1191.

The English common law and statutory provisions regulating bail procedures were simplified to some extent in various colonial charters. The earliest colonial provision concerning bail is found in section eighteen of the Massachusetts Body of Liberties of 1641.[12] This enactment deviated sharply from the English tradition by granting an affirmative, though limited, right to bail. Excluded were capital crimes, contempts of court, and other cases to be expressly designated by the legislature. The Massachusetts provision influenced article XI of the Pennsylvania Charter of Liberty (1682),[13] which granted a constitutional right to bail

---

10. 3 Car. 1, c. 1 (1628); *see* Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb.L.Rev. at 58–66 (1977); Foote, *supra* note 9, at 966–67; Meyer, *Constitutionality of Pretrial Detention* (pt. 1), 60 Geo.L.J. at 1180–85 (1972).

11. 31 Car. 2, c. 2 (1679); *see* Duker, *supra* note 10, at 65–66; Foote, *supra* note 9, at 967; Meyer, *supra* note 10, at 1185–90.

12. *Reprinted in* 5 Sources and Documents of United States Constitutions 49 (W. Swindler ed. 1975) [hereinafter cited as 5 Sources and Documents]. *See* Duker, *supra* note 10, at 79; Foote, *supra* note 9, at 975; Meyer, *supra* note 10, at 1162–63.

13. *Pennsylvania Charter of Liberty, Laws Agreed Upon in England*, May 5, 1682, art. XI, *reprinted in* 8 Sources and Documents of United States Constitutions 259 (W. Swindler ed. 1979) [hereinafter cited as 8 Sources and Documents] *and in* 5 American Charters, *supra* note 7, at 3061. *See* Foote, *supra* note 9, at 975.

in a form that was later adopted by Pennsylvania and North Carolina in their constitutions in 1776, and was widely copied in 19th century state constitutions: "That all persons shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or presumption great." [14] Many other colonial charters, however, simply guaranteed that the subjects of the colony would enjoy the same liberties as Englishmen,[15] which, as we have seen, only encompassed a right to bail as defined by Parliament.

When the colonies asserted their independence in 1776, they largely adopted the bail provisions from their colonial charters into their state constitutions. The Massachusetts Constitution of 1780 included an excessive bail clause, but the right to bail itself was relegated to statutory status. This excessive bail clause makes clear that it was intended as a limitation on the judiciary and not the legislature: [16] "No *magistrate* or *court* of law shall demand excessive bail or sureties . . . ." [17] The New Hampshire Constitution of 1784 used identical language,[18] while the Maryland Constitution of 1776 stated "[t]hat excessive bail ought not to be required . . . by the *courts*

of law." [19] This explicit language refutes appellant's contention that the early excessive bail clause, standing alone, was generally intended to embody a limitation on the legislature by granting a right to bail as well as a protection against judicial abuse. Finally, the state constitutions of North Carolina and Pennsylvania, which were the only state constitutions of those adopted before the Bill of Rights to include an express right to bail in noncapital cases, *also* contained a distinct excessive bail clause.[20] The inclusion of two separate provisions regulating the bail system suggests a recognition of their differing language and purposes.

## C. *The Bill of Rights*

The excessive bail clause was a noncontroversial provision that provoked very little discussion when Congress considered the adoption of the Bill of Rights in 1789. The only reference in the record of congressional debate attacked its asserted vagueness,[21] but that statement provoked no response and the amendment was approved shortly afterward.

---

14. Pa.Const. of 1776, § 28, *reprinted in* 8 Sources and Documents, *supra* note 13, at 283; *see* N.C.Const. of 1776 art. XXXIX, *reprinted in* 7 Sources and Documents of United States Constitutions 407 (W. Swindler ed. 1978) [hereinafter cited as 7 Sources and Documents]. (In 1868, North Carolina eliminated the right to bail from its constitution.) *See also*, Foote, *supra* note 9, at 975.

At present, 36 state constitutions provide an absolute right to bail in noncapital cases. *See Petition of Humphrey*, 601 P.2d 103, 108–10 (Okl.Cr.App.1979) (Appendix I).

15. *See* Duker, *supra* note 10, at 80–81; Meyer, *supra* note 10, at 1163.

16. *See* Duker, *supra* note 10, at 82.

17. Mass.Const. of 1780, pt. 1, art. XXVI, *reprinted in* 5 Sources and Documents, *supra* note 12, at 95, *and in* 3 American Charters, *supra* note 7, at 1892 (emphasis added).

18. N.H.Const. of 1784, art. I, § XXXIII, *reprinted in* 6 Sources and Documents of United States Constitutions 347 (W. Swindler ed. 1976), *and in* 4 American Charters, *supra* note 7, at 2457.

19. Md.Const. of 1776, Declaration of Rights, § XXII, *reprinted in* 4 Sources and Documents of United States Constitutions 373 (W. Swindler ed. 1975), *and in* 3 American Charters, *supra* note 7, at 1688 (emphasis added).

20. N.C.Const. of 1776, Declaration of Rights, § X; *id.* art. XXXIX, *reprinted in* 7 Sources and Documents, *supra* note 14, at 402, 407, *and in* 5 American Charters, *supra* note 7, at 2788, 2793; Pa.Const. of 1776, §§ 28, 29, *reprinted in* 8 Sources and Documents, *supra* note 13, at 283, *and in* 5 American Charters, *supra* note 7, at 3089; *see* Meyer, *supra* note 10, at 1191.

21. The entire reference is as follows:

Mr. Livermore.—The clause seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do not think it necessary. What is meant by the terms excessive bail? Who are to be the judges?

1 Annals of Cong. 782 (Gales & Seaton eds. 1789). The speaker then made similarly brief objections to the vagueness of the other clauses of the amendment. *Id.* at 782–83.

Appellant adopts the argument of Professor Foote that the narrowly drawn excessive bail clause was the product of oversight and inadvertence, which masked the framers' true intention to include a right to bail in the Bill of Rights. *See* Foote, *supra* note 9, at 970–71, 984–89. Professor Foote acknowledges that Congress had available examples of an explicit right to bail in colonial charters and state constitutions going back to the Massachusetts Body of Liberties of 1641, in the Northwest Territory Ordinance of 1787,[22] and in the contemporaneous Judiciary Act of 1789. *See id.* at 970–71. Professor Foote explains the language of the Eighth Amendment excessive bail clause as a "drafting error," the result of "inadvertence" by George Mason, the drafter of the Virginia Declaration of Rights and of the amendments proposed to Congress by the Virginia ratification convention in 1788. *Id.* at 984–87. Under this theory, Mason, who was not a lawyer, failed to appreciate the "tripartite nature of the English protection against abusive pretrial detention, involving procedure and the right to bail as well as control of the judicial abuse of excessive bail," *id.* at 986, and used the limited language of the English Bill of Rights of 1689 to stand for the whole. The argument assumes, without foundation, that English law granted an absolute right to bail.[23] As we have seen, the definition of bailable offenses was left to Parliament, and the colonial charters and early constitutions varied in establishing a fundamental right to bail. In addition, even if the clause was lifted imperfectly from the English Bill of Rights of 1689, the clause was approved in Congress and ratified by the states in the form in which it stood and without indication of Mason's asserted intention to provide a right to bail. *See* Duker, *supra* note 10, at 84–85 n.303. Indeed, the contemporary understanding of the limited meaning of the excessive bail clause may be inferred from other states' proposals for the Bill of

Rights and from the contemporaneous passage of an explicit federal statutory right to bail. *See id.* at 85–86; Meyer, *supra* note 10, at 1164, 1190–94.

In addition to Mason's proposal from Virginia, seven other states made proposals for the Bill of Rights. The North Carolina and Pennsylvania proposals included only an excessive bail clause, although their constitutions each contained both an excessive bail clause and a right to bail provision. *See* Duker, *supra* note 10, at 83; Meyer, *supra* note 10, at 1192. Of the other five proposals, one (New York) included an excessive bail clause, but not one contained a right to bail provision. *See* Meyer, *supra* note 10, at 1193.

In the same session in which Congress considered the proposals and finally approved a Bill of Rights, it also drafted and passed the Judiciary Act of 1789. The latter act established a statutory right to bail in noncapital cases. *See* note 6, *supra*. Although the Eighth Amendment and the statutory right to bail may have developed from two distinct sources, and there is nothing in the congressional record to suggest that the implications of the differing language were addressed, *see* Foote, *supra* note 9, at 971–73; Tribe, *supra* note 6, at 398, it must be presumed that Congress recognized the clear difference in scope of the clauses. The alternative explanation, that the clearly differing language was fortuitous, cannot be simply inferred without any evidence that Congress intended the differing language to carry the same meaning. Moreover, the right to bail in the 1789 Act would have been a redundancy if the excessive bail language meant the same thing even in capital cases.

### D. Case Law

The Supreme Court has never ruled on whether the excessive bail clause imports a

---

**22.** An Ordinance for the Government of the Territory of the United States north-west of the river Ohio, July 13, 1787, art. II, re-enacted by Congress in 1789, 1 Stat. 50–53.

**23.** The argument also overlooks the fact that procedural protection against abusive pretrial detention was provided in the U.S. Constitution by Art. I, § 9, cl. 2, which preserved the privilege of the writ of habeas corpus. *See* Meyer, *supra* note 10, at 1190.

right to bail. The government cites the Court's language in *Carlson v. Landon*, 342 U.S. 524, 546, 72 S.Ct. 525, 537, 96 L.Ed. 547 (1952), that "the very language of the Amendment fails to say all arrests are bailable." *Carlson* involved the denial of bail to alien Communists pending deportation proceedings. The Court concluded that the Eighth Amendment does not apply to such civil proceedings. Accordingly, the *Carlson* holding does not directly concern criminal cases, particularly as the Court emphasized Congress' broad powers to deal with aliens. Moreover, the *Carlson* dictum regarding the scope of an Eighth Amendment right to bail conflicts with the tenor of *Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951), decided the same term. *Stack v. Boyle*, although concerned with the excessiveness of the bail orders under review there, recognized the "traditional right to freedom before conviction [which] permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." *Id.* at 4, 72 S.Ct. at 3.[24] Lower courts have relied, alternatively, on the dicta of both *Carlson* and *Stack* to find or deny a constitutional right to bail, but without any convincing resolution.[25]

### E. *Constitutional Scheme*

Apart from the asserted support in the history of the development and adoption of the excessive bail clause, appellant argues that the apparent anomaly of the excessive bail clause can only be explained by construing it to grant a right to bail. The core of this argument is that the excessive bail clause, insofar as it operates as a limit on congressional power, is a futility if Congress is prohibited from requiring exces-

sively high bail but is free to deny bail altogether by making some or all crimes nonbailable. The only explanation for prohibiting excessively high bail but allowing the denial of all bail would be a concern for economic equality between the rich and the poor, which the historical evidence clearly negates.[26] To avoid rendering the excessive bail clause "surplusage," the argument runs, it must be broadly interpreted to grant a right to bail. *See* Foote, *supra* note 9, at 987.

This argument presumes, however, that the excessive bail clause was intended primarily to limit the legislative power of Congress rather than to limit the discretion of the judiciary in setting individual bail. The historical origins of the excessive bail clause, as well as its narrow language, indicate that its primary purpose is to limit the judiciary. The major reason advanced for construing the clause as directed to Congress (and thus as a broader limitation on its powers) is the constitutional context of the Bill of Rights itself. The Bill of Rights, it is argued, had as its "central concern . . . protection against abuse by Congress." *Id.* at 969, 988; Tribe, *supra* note 6, at 400. *See also Ingraham v. Wright*, 430 U.S. 651, 664–66, 97 S.Ct. 1401, 1408–10, 51 L.Ed.2d 711 (1977) (history of adoption of Eighth Amendment indicates that cruel and unusual punishment clause was intended to restrict Congress as well as the judiciary). A cursory examination of other provisions contained in the Bill of Rights, however, reveals that the conduct of the judicial branch was an important, if not the chief, concern. The indictment, double jeopardy, and due process clauses of the Fifth Amendment, and the Sixth Amendment's

---

24. The Court in *Stack* added that "[u]nless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." 342 U.S. at 4, 72 S.Ct. at 3. More recently, however, the Court has stated that the presumption of innocence has "no application to a determination of the rights of a pretrial detainee . . . ." *Bell v. Wolfish*, 441 U.S. at 533, 99 S.Ct. at 1870.

25. *Compare Trimble v. Stone*, 187 F.Supp. 483 (D.D.C.1960) (constitutional right to bail extends to juvenile cases) (citing *Stack v. Boyle, supra* ) *with United States ex rel. Covington v. Coparo*, 297 F.Supp. 203, 205 & n.6 (S.D.N.Y. 1969) (Congress may define which criminal offenses are bailable) (citing *Carlson v. Landon, supra* ). *See generally* Note, *Preventive Detention Before Trial*, 79 Harv.L.Rev. 1489, 1498–1500 (1966).

26. *See* Foote, *supra* note 9, at 989–92.

criminal trial rights, clearly were intended to curtail the powers of the courts as well as those of Congress in legislating for the courts.

A second related argument is that while an unlimited legislative power to define the boundaries of the citizen's rights, such as the right to bail, is consistent with the English theory of civil liberties in which Parliament is the ultimate authority, it is generally inconsistent with a constitutional form of government like ours. Foote, *supra* note 9, at 969, 988; *see* Tribe, *supra* note 6, at 400. This reasoning requires, however, an antecedent finding that the right to bail is a fundamental right that the framers of the Bill of Rights meant to protect against congressional encroachment, because plainly not all asserted rights are constitutionally protected. While the history of the development of bail reveals that it is an important right, and bail in noncapital cases has traditionally been a federal statutory right, neither the historical evidence nor contemporary fundamental values implicit in the criminal justice system requires recognition of the right to bail as a "basic human right," Foote, *supra* note 9, at 969, which must then be construed to be of constitutional dimensions.

## III. DUE PROCESS

Appellant attacks the statutory procedure for pretrial detention on multiple grounds as violative of his Fifth Amendment due process rights. Chief among these complaints are the contentions (1) that pretrial detention is punishment that cannot be imposed "prior to an adjudication of guilt in accordance with due process of law," *Bell v. Wolfish*, 441 U.S. at 535, 99 S.Ct. at 1872 (footnote omitted); (2) that the hearing, at a minimum, must provide rights of confrontation, cross-examination, and compulsory process, and (3) that the notice of the past

acts that would support a finding of "dangerousness" was deficient. Appellant also contends that the statutory burden of proof is inadequate, and that the statute as a whole is violative of substantive due process and is both facially overbroad and unconstitutionally vague. We address these contentions in the order presented.

### A. *Detention as Punishment*

■ The government concedes that if detention is punishment, it cannot be imposed absent conviction for the crime charged, *i. e.*, a fair trial resulting in an adjudication of guilt with the panoply of protections guaranteed by the Fifth and Sixth Amendments. The Supreme Court recognized this fundamental principle in *Bell v. Wolfish*: "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id. See also Ingraham v. Wright*, 430 U.S. at 671–72 n.40, 674, 97 S.Ct. at 1412–13 n.40, 1414; *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165–67, 186, 83 S.Ct. 554, 565–67, 576, 9 L.Ed.2d 644 (1963); *Wong Wing v. United States*, 163 U.S. 228, 237, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896). Whether pretrial detention constitutes prohibited punishment turns on whether the statute is penal or regulatory in character. We conclude that appellant's contention that incarceration inevitably constitutes punishment is without merit. As the Supreme Court has said: "Detention is a usual feature of every case of arrest on a criminal charge, even when an innocent person is wrongfully accused; but it is not imprisonment in a legal sense." *Wong Wing v. United States*, 163 U.S. at 235, 16 S.Ct. at 980.[27]

The distinction between penal and regulatory sanctions is often elusive, but the compilation of traditional tests set out by the Court in *Kennedy v. Mendoza-Martinez*,

27. *Wong Wing* involved the detention of aliens pending inquiry into their status, which was found unobjectionable, and their subsequent imprisonment at hard labor without trial, which was invalidated. Detention under the challenged statute does comprehend a longer period of confinement than that administrative-

ly necessary in any arrest to effect processing, presentment, and a bail hearing, if appropriate, but is limited to the pretrial period which may not exceed 60 days. D.C.Code 1973, § 23–1322(d)(2)(A). After this 60-day period, generally the defendant must be admitted to bail. *Id.*

and reaffirmed and applied in *Bell v. Wolfish*,[28] provides authoritative guidance:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. [*Kennedy v. Mendoza-Martinez*, 372 U.S. at 168–69, 83 S.Ct. at 567–68 (footnotes omitted), *quoted in Bell v. Wolfish*, 441 U.S. at 537–38, 99 S.Ct. at 1873–74.]

■ As this test explicitly recognizes, the various factors may point in differing directions, and there can be no mechanical application of the test. Characterization of pretrial detention is a particularly close question. Nevertheless, we conclude, after considering all of the relevant factors, that pretrial detention is regulatory rather than penal in nature. Although detention pending trial invokes an affirmative restraint, historically it has not been regarded as punishment where the purpose has been to prevent flight or to prevent the coercion or intimidation of witnesses. *See Blunt v. United States*, 322 A.2d at 584. *See also Carbo v. United States*, 82 S.Ct. 662, 7 L.Ed.2d 769 (1962) (Douglas, J.). The critical question is whether detention pending trial for the purpose of protecting the community from the detainee's established dangerousness is an "alternative purpose" contemplated by the *Mendoza-Martinez* factors. The traditional reasons for pretrial detention, preventing flight or the intimidation of witnesses, serve the "alternative purpose" of preserving the integrity of the judicial process, and thus are preventive and forward-looking.[29] Similarly, pretrial detention to prevent repetition of dangerous acts under § 23–1322(a)(1) by incapacitating the detainee seeks to curtail reasonably predictable conduct, not to punish for prior acts.

The Court's opinion in *Bell v. Wolfish, supra*, emphasizes governmental purpose as particularly significant in determining whether the challenged conditions imposed on pretrial detainees were penal or regulatory.

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." [441 U.S. at 538–39, 99 S.Ct. at 1873–74 (footnotes omitted).]

The statutory history makes clear that pretrial detention was intended to protect the safety of the community until it can be determined whether society may properly punish the defendant. Pretrial detention

---

**28.** In *Bell v. Wolfish*, the Court was called upon to determine whether certain jail conditions were penal or regulatory as applied to unconvicted pretrial detainees. The petitioners did not challenge and the Court specifically reserved any determination regarding the constitutionality of the initial decision to detain. 441 U.S. at 534 & n.15, 99 S.Ct. at 1871 & n.15.

**29.** Justice Stevens, dissenting in *Bell v. Wolfish*, disagreed with the majority's application of the *Kennedy v. Mendoza-Martinez* standard and suggested that a distinguishing principle between punishment and a regulatory sanction is that punishment is "backward-looking, personal, and normative," while a regulatory sanction is "forward looking, general, and nonnormative." *Bell v. Wolfish*, 441 U.S. at 581–82 n.10, 99 S.Ct. at 1896–97 n.10. Justice Stevens concluded:

> By contrast, pretrial detention is acceptable as a means of assuring the detainee's presence at trial and of maintaining his and his fellows' safety in the meantime. Its focus is therefore essentially forward looking, general, and nonnormative. Because this type of government sanction is primarily designed for the future benefit of the public at large and implies no moral judgment about the person affected it is properly classified as regulatory. [*Id.*]

was not intended to promote either of the "traditional aims of punishment—retribution and deterrence." *Kennedy v. Mendoza-Martinez*, 372 U.S. at 168, 83 S.Ct. at 567.[30] Nor does it seek to rehabilitate the detainee, another purpose ordinarily associated with punishment.[31] Pretrial detention does purposefully incapacitate the detainee from committing further crimes pending trial on the criminal charges, and such physical restraint is necessarily also one of the functions of imprisonment after conviction. Incapacitation, however, is distinct from general deterrence, which operates by example, not by physical restraint. *See* note 30, *supra.* Significantly, pretrial detention is closely circumscribed so as not to go beyond the need to protect the safety of the community pending the detainee's trial. Such detention is not to exceed 60 days, by which time either the detainee must be brought to trial, or bail must be set. D.C. Code 1973, § 23–1322(d)(2)(A). Moreover, the detention may be ended "whenever a judicial officer finds that a subsequent event has eliminated the basis for such detention." *Id.* § 23–1322(d)(2)(B). As the legislative history makes clear, "[o]ne such circumstance might be the court's granting a motion to suppress most of the Government's evidence." H.R.Rep.No.91–907, 91st Cong., 2d Sess. 184 (1970).[32]

**30.** As the Court noted in *Bell v. Wolfish*, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." 441 U.S. at 539 n.20, 99 S.Ct. at 1874 n.20 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. at 168, 83 S.Ct. at 567). In neither *Mendoza-Martinez* nor *Wolfish* does the Court indicate that "deterrence" is meant to encompass what is sometimes referred to as specific deterrence, *i. e.*, "deterrence" through physical incapacitation, as well as the generally understood meaning of general deterrence, *i. e.*, the existence of a criminal sanction and the example of its application deters others for fear of similar consequences.

**31.** *See Ingraham v. Wright*, 430 U.S. at 686–87, 97 S.Ct. at 1420–21 (White, J., dissenting) (footnote and citation omitted): "The relevant inquiry is not whether the offense for which a punishment is inflicted has been labeled as criminal, but whether the purpose of the deprivation is among those ordinarily associated

*B. Procedural Due Process*

Appellant next contends that even if pretrial detention is not found to be a penal sanction which would trigger the full procedural protections of a criminal trial under the Fifth and Sixth Amendments, the statutory provisions nonetheless are violative of the Due Process Clause by not providing the minimal procedural framework necessary to a fair hearing. In particular, appellant asserts that due process requires that a defendant in a pretrial detention hearing be afforded rights of confrontation, cross-examination, and compulsory process, and that the government must prove each required finding by proof beyond a reasonable doubt.[33] The statute provides certain procedural formalities and safeguards but does not guarantee the several procedural protections which appellant asserts are constitutionally required. The two judges in the respective pretrial detention hearings under review here made conflicting rulings on the adequacy of the statutory protections. For the reasons that follow, we conclude that the statutory procedures satisfy the minimum demands of procedural due process before a person may be detained pending trial on the grounds of dangerousness to the community.

■ Although pretrial detention is not punishment, it clearly implicates a liberty

with punishment, such as retribution, rehabilitation, or deterrence."

**32.** Appellant also contends that pretrial detention unconstitutionally punishes for the "status" of being "dangerous," relying on *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (punishment for status of drug addiction violates Eighth and Fourteenth Amendments' prohibition on cruel and unusual punishment). Because we conclude that such detention is not punishment, the argument falls of its own weight. Moreover, a necessary prerequisite to pretrial detention is an arrest for a specified crime, which crime is an act beyond mere status. *See Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1258 (1968) (state may not punish status of alcoholism but may punish for specific acts such as public drunkenness).

**33.** The due process requirement of notice is addressed in part III(C), *infra.*

interest that requires a fair hearing within the mandates of procedural due process. *See Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 1759, 36 L.Ed.2d 656 (1973) (due process protections attach to probation revocation); *Morrissey v. Brewer,* 408 U.S. 471, 480–82, 92 S.Ct. 2593, 2599–01, 33 L.Ed.2d 484 (1972) (parole revocation implicates protected liberty interest). Due process is a flexible concept, however, and "not all situations calling for procedural safeguards call for the same kind of procedure." *Id.* at 481, 92 S.Ct. at 2600. The question therefore remains "what process is due," *id. See Mathews v. Eldridge,* 424 U.S. 319, 333–35, 96 S.Ct. 893, 901–03, 47 L.Ed.2d 18 (1976), and whether the procedures provided by statute meet the minimum due process requirements.

The pretrial detention statute provides for a hearing before a judicial officer, D.C. Code 1973, § 23–1322(b)(1), (c)(1), at which the defendant is entitled to representation by counsel and "to present information by proffer or otherwise, to testify, and to present witnesses in his own behalf." *Id.* § 23–1322(c)(4). The information presented to the judicial officer by either the government or the defense may be by proffer and "need not conform to the rules pertaining to the admissibility of evidence in a court of law." *Id.* § 23–1322(c)(5). Upon the information presented at the hearing, the judicial officer must make three separate findings, with particular burdens of proof: (1) that there is clear and convincing evidence that the accused falls into one of the categories of persons eligible for detention, *e. g.,* a person charged with a dangerous crime, *id.* § 23–1322(b)(2)(A); (2) that, based on the accused's "pattern of behavior consisting of his past and present conduct, and the other factors set out in section 23–1321(b)," there is "no condition or combination of conditions of release which will reasonably assure the safety of any other person or the community," *id.* § 23–1322(b)(2)(B)(i); and (3) that there is "a substantial probability that the person committed by the offense for which he is present before the judicial officer," *id.* § 23–1322(b)(2)(C).

The legislative history of the statute confirms Congress' intent that the information upon which the judicial officer makes his finding need not be sworn testimony, and that the hearing is not designed to afford defendants a discovery device. Thus, in providing that the finding of substantial probability is to be based on information presented "by proffer or otherwise," the House Report anticipates

> that, as is the present practice under the Bail Reform Act, ... the use of sworn testimony will be the exception and not the rule.... [B]ail hearings under the Bail Reform Act, which frequently result in detention of the accused, proceed primarily by way of proffers. They are not formal trials requiring strict adherence to technical rules of evidence. *If the court is dissatisfied with the nature of the proffer, it can always, within its discretion, insist on direct testimony.* But the discretion should be left to the court without imposing on it the burden of limiting admissibility to that it would permit a jury to hear. [H.R.Rep.No.91–907, 91st Cong., 2d Sess. 182, 184 (1970) (emphasis added).]

Accordingly, hearsay evidence may be presented, although the court may require direct testimony if dissatisfied with a proffer.

The legislative history does not discuss the scope of cross-examination permitted of witnesses who are called by the government. Section 1322(c)(4) gives the accused the right "to present witnesses in his own behalf," but the House Report states that the accused has only a *conditional* right to call *adverse* witnesses:

> He may not, of course, call witnesses who ordinarily would be expected to testify for the Government at trial, *unless he can proffer to the court in reasonable detail how he expects their testimony to negate substantial probability.* The hearing provided by subsections (b) and (c) is not designed to afford defendants a discovery device. Discovery is to be obtained pursuant to the rules of court. [H.R.Rep.No. 91–907, *supra* at 183 (emphasis added).]

In the first of the two hearings under review here, Judge Bowers agreed with appellant that the statute was constitutionally deficient, and the government appeals this determination. Although the basis for the court's ruling shifted during the proceeding, the court ultimately held (1) that hearsay would not be admitted because the defendant has a constitutional right of confrontation, and to that extent the statute is constitutionally deficient, and (2) that the defendant has a right to call adverse witnesses without a proffer, i. e., a right to compulsory process, under *Blunt v. United States*, 322 A.2d at 585. Because the government refused to make the complainant available, Judge Bowers denied the motion for pretrial detention.

In the second proceeding, Judge Norman held that the accused has a right to confront and cross-examine the witnesses against him on the issue of whether the crime charged was committed, and therefore excluded hearsay evidence on that issue, including the complainant's report of the crime and her line-up identification of the appellant. The court did accept hearsay evidence regarding the issues of the accused's past and present conduct and whether any conditions of release could assure the safety of the community. The court held there was no requirement that the complainant be made available for cross-examination without a proffer from the defense as to how her testimony would negate "substantial probability" that the charged offense was committed. Appellant contests the rulings admitting hearsay evidence and denying an unconditional right to call adverse witnesses. The government challenges the ruling excluding the complainant's hearsay statements.

Guidance in determining "what process is due" in a pretrial detention hearing may be derived from the Supreme Court's decision in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). *Gerstein* held that an arrestee is entitled to a timely hearing before a magistrate for a "judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." 420 U.S. at 114, 95 S.Ct. at 863. The Court further held that "the full panoply of adversary safeguards—counsel, confrontation, cross-examination, and compulsory process for witnesses," *id.* at 119, 95 S.Ct. at 865, which the District Court and Court of Appeals had held was mandatory, is not constitutionally required.[34] *Id.* at 120–26, 95 S.Ct. at 866–69. *Morrissey*, on the other hand, held that a preliminary hearing must be held, with certain procedural safeguards, to determine whether there is probable cause to believe the parolee has committed a parole violation. The hearing must be held before a neutral magistrate and the parolee given notice and an opportunity to present evidence. 408 U.S. at 486–87, 92 S.Ct. at 2602–03. The parolee also is given a right to confront and cross-examine "person[s] who [have] given adverse information on which parole revocation is to be based," unless the hearing officer specifically finds that the witness "would be subjected to a risk of harm if his identity were disclosed." *Id.* at 487, 92 S.Ct. at 2603. The preliminary hearing is to be followed by the revocation hearing at which there is notice, an opportunity to present evidence, *id.* at 487–89, 92 S.Ct. at 2603–04, and a right to confront and cross-examine adverse witnesses ("unless the hearing officer specifically finds good cause for not allowing confrontation," *id.* at 489, 92 S.Ct. at 2604).

Appellant contends that, at a minimum,[35] the rights of confrontation and cross-exami-

---

**34.** The Court decided the constitutional requirements for a preliminary hearing under the Fourth Amendment rather than the Due Process Clause of the Fifth Amendment, noting that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the "process

that is due" for seizures of person or property in criminal cases, including the detention of suspects pending trial." *Gerstein v. Pugh*, 420 U.S. at 125 n.27, 95 S.Ct. at 868 n.27.

**35.** Appellant also contends that the burden of proof should be the criminal trial standard of proof beyond a reasonable doubt, rather than

nation of adverse witnesses required in a preliminary parole revocation hearing by *Morrissey* should be similarly required in a pretrial detention hearing. Because "due process is flexible and calls for such procedural protections as the particular situation demands," *id.* 408 U.S. at 481, 92 S.Ct. at 2600, an independent examination must be made of the due process requirements for pretrial detention. In determining the scope of procedural protections required, we must consider the individual's interest affected by the official action, the nature of the governmental function involved, and the probable value of and enhanced accuracy from additional procedural safeguards. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903; *see Vitek v. Jones*, 445 U.S. 480, 495 (1980); *Morrissey v. Brewer*, 408 U.S. at 481, 92 S.Ct. at 2600. *See generally* L. Tribe, American Constitutional Law §§ 10–12 to –13 (1978). Consideration of the individual's liberty interest and the government's interests in a simplified yet fair pretrial detention hearing leads us to the conclusion that the interests involved are closer to those in a *Gerstein* preliminary hearing than those involved in a *Morrissey* hearing, and that the statutory procedures challenged here are constitutionally adequate.[36]

The effect of the findings in a detention hearing and a preliminary (*Gerstein*) hearing is the same: each hearing determines whether the accused may be detained pending trial. The individual's liberty interest affected by each proceeding is accordingly the same. In *Gerstein*, the Court explicitly stated that the "sole issue is whether there is probable cause *for detaining the arrested person pending further proceedings*," 420 U.S. at 120, 95 S.Ct. at 866 (emphasis added), and concluded that a full adversary

hearing was not required. Appellant attempts to distinguish the liberty interest involved in *Gerstein* as "practically less severe and conceptually entirely different" because a person detained under *Gerstein* may also be entitled to a hearing on bail or conditions for release. *See* D.C.Code 1973, § 23–1321. This argument confuses the statutory right to a bail hearing with the procedural protections that due process requires for any pretrial detention. The bail hearing, in which the court will determine likelihood of flight and whether any conditions "will reasonably assure the appearance of the person for trial or the safety of any other person or the community," *id.* § 23–1321(a), does not offer any procedural protections beyond the *Gerstein* requirements. The District of Columbia statute specifically provides that "[i]nformation stated in, or offered in connection with, any order entered pursuant to this section need not conform to the rules pertaining to the admissibility of evidence in a court of law." *Id.* § 23–1321(f).[37] An arrestee has no constitutional rights to cross-examination, confrontation, or compulsory process or to proof beyond a reasonable doubt in a bail proceeding. Thus characterizing detention upon a probable cause determination under *Gerstein* as only "indirectly" resulting in detention because the arrestee could be released on bail or subject to other conditions of release is misleading. Indeed, if the arrestee is released on personal recognizance, there is no requirement under *Gerstein* that any preliminary hearing be held. Only when the arrestee is subject to prolonged detention or pretrial release "accompanied by burdensome conditions that effect a significant restraint of liberty," *id.* at 114, 95 S.Ct. at 863; *see id.* at 125 n.26, 95 S.Ct. at 868 n.26, does *Gerstein* apply. In

---

the probable cause standard of the preliminary hearings in both *Gerstein* and *Morrissey*, and apparently contends that the right to confront and cross-examine the complainant is absolute.

**36.** *See* note 34, *supra.*

**37.** *See* Super.Ct.Cr.R. 5(d)(1) ("Preliminary Examination"): "The purpose of a preliminary

examination is not for discovery .... The finding of probable cause may be based upon hearsay evidence in whole or in part. The defendant may cross-examine witnesses against him and may introduce evidence in his own behalf."

short, the same liberty interest of the individual—to be free from pretrial detention—is involved in a pretrial detention hearing and a *Gerstein* hearing on probable cause.

Turning to a comparison of the nature of the government's interest in the two proceedings, we find that they are also similar in scope. At the outset, the government has an obvious interest in not conducting a full-blown criminal proceeding twice, once for pretrial detention and a second time for the trial on the charges. Indeed, the individual's and the government's mutual interest in holding that the hearing soon after the time of the arrest [38] necessarily precludes the full-scale preparation and investigation that is commensurate with a criminal trial. Conversely, the limited function of a pretrial detention hearing, i.e., to determine the appropriateness of detention for a maximum of 60 days pending a trial on the charges with the full panoply of criminal trial rights, weighs in favor of a simplified hearing. The *Gerstein* Court distinguished the greater procedural formalities required by *Morrissey* in part on the basis of the overall procedural protections otherwise afforded by the criminal justice system.[39] In addition, the Court distinguished the preliminary revocation proceeding in *Morrissey*, to be held near the place of the alleged parole violation, by its broader function of "gathering and preserving live testimony," *id.* at 121 n.22, 95 S.Ct. at 866 n.22, which function is shared by neither a probable cause preliminary hearing nor a pretrial detention hearing.

### 1. Rights of Confrontation and Cross-Examination

With regard to the specific procedural protections of confrontation and cross-examination, which Judge Bowers ruled were constitutionally required and which Judge Norman imposed in part, we hold that the government may proceed by the use of proffer and hearsay, subject to the discretion of the judge as to the nature of the proffer and the need for admissible evidence. The rights of confrontation and cross-examination together generally prohibit the use of hearsay statements unless they fall within a recognized exception,[40] or unless they are supported by other "indicia of reliability," [41] although the right of confrontation is not co-extensive with the evi-

**38.** D.C.Code 1973, § 23–1322(c)(3) provides:

The pretrial detention hearing shall be held immediately upon the person being brought before the judicial officer for such hearing unless the person or the United States attorney moves for a continuance. A continuance granted on motion of the person shall not exceed five calendar days, unless there are extenuating circumstances. A continuance on motion of the United States attorney shall be granted upon good cause shown and shall not exceed three calendar days. The person may be detained pending the hearing.

**39.** "[The] revocation proceedings [in *Morrissey*] may offer less protection from initial error than the more formal criminal process, where violations are defined by statute and the prosecutor has a professional duty not to charge a suspect with crime unless he is satisfied of probable cause." *Gerstein v. Pugh*, 420 U.S. at 121–22 n.22, 95 S.Ct. at 866–67 n.22.

**40.** The rights of confrontation, cross-examination, and compulsory process, guaranteed to the defense in a criminal trial by the Sixth Amendment, are related and overlapping rights. Generally speaking, a right of confron-

tation is the right to be present and to hear the live testimony of available witnesses whose statements are used against the defendant. *See Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968); *Pointer v. Texas*, 380 U.S. 400, 403–05, 85 S.Ct. 1065, 1067–69, 13 L.Ed.2d 923 (1965). *See generally* Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 Harv.L.Rev. 567, 569–79 (1978). The right of cross-examination, derived from the right of confrontation, is the right to cross-examine the government's witnesses presented at trial. *See Pointer v. Texas*, 380 U.S. at 404, 85 S.Ct. at 1068; Westen, *supra* at 579–81.

**41.** The Supreme Court recently reexamined the relationship between the right of confrontation and the hearsay rule. In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court held that the introduction at defendant's trial of testimony obtained at a preliminary hearing from a witness who did not appear at trial did not violate defendant's right of confrontation, where the witness had been subjected to the equivalent of significant cross-examination at the preliminary hearing. This holding rested upon a showing that the witness

dentiary rules of hearsay. *See Dutton v. Evans*, 400 U.S. 74, 81–82, 91 S.Ct. 210, 215–216, 27 L.Ed.2d 213 (1970); *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970); *Harrison v. United States*, D.C.App., 407 A.2d 683, 686 (1979). Judge Bowers apparently relied on these constitutionally-mandated trial rights in ruling that all hearsay must be excluded. We disagree, finding that, as in a preliminary hearing for probable cause, the government may proceed by proffer or hearsay. *See Gerstein v. Pugh*, 420 U.S. at 121–22, 95 S.Ct. at 866–67; *Blunt v. United States*, 322 A.2d at 583 n.4 ("Given the unique nature of [pretrial detention] proceedings, a full trial of the general issue would be impracticable," and evidence by proffer is constitutionally sufficient.) The liberty interest at stake and the function of the two proceedings are so similar as to provide no basis for distinguishing them.[42]

■ The related trial right of compulsory process, as provided by the Sixth Amendment, guarantees that the defendant may compel the attendance of witnesses in his favor. In the trial context, the defendant need not proffer how the requested witness will testify in his favor; the defendant only carries the burden of identifying and securing the attendance of those witnesses whose testimony he desires. *See* Westen, *supra* note 39, at 601–13. In neither of the two pretrial detention hearings appealed here was the complainant produced. The government relied on information and statements other than statements by the complainant. Holding, as we do, that the government may proceed by proffer or otherwise, we conclude that there is no reason to distinguish the complainant from other possible witnesses to an offense, and that the government may proffer a complainant's hearsay statements as in a probable cause preliminary examination. Consistent with this holding, we further conclude that the court may require a proffer from the defense before compelling the presence of an adverse witness. The pretrial detention statute provides the accused with a right to present witnesses in his favor. Such an opportunity to respond is a fundamental procedural right which the government has no interest in restricting. Nevertheless, with regard to the government's witnesses, and particularly the complaining witness, the government does have an interest in preventing premature discovery. It also has an interest in protecting the emotional and physical well-being of its witnesses. *See Washington v. Clemmer*, 119 U.S.App.D.C. 216, 219 n.11, 339 F.2d 715, 718 n.11 (1964). Under our holding that the government may proceed by proffer or hearsay, cross-examination for the limited purpose of impeaching the witness' credibility is an insufficient reason to compel a witness' presence. The requirement of a preliminary proffer, regarding the manner in which a witness' testimony will tend to negate substantial probability that the accused committed the charged offense, is a reasonable limitation on the accused's right to call witnesses in his favor.

*Blunt v. United States, supra,* was relied upon by Judge Bowers and is cited by ap-

---

was unavailable for trial and that the hearsay testimony bore adequate "indicia of reliability." *Id.* at 2542–43. *Roberts* addressed the issue of whether testimony obtained at a preliminary hearing may be used against a defendant at trial without violating defendant's right of confrontation; it did not address the issue which we face here, namely, whether the government may proceed by proffer and hearsay at a pretrial detention hearing.

**42.** Appellant relies on the language in *Gerstein* wherein the Court distinguished the nature of the functions in *Gerstein* and *Morrissey*: "[A probable cause hearing] does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial . . . ." 420 U.S. at 121, 95 S.Ct. at 866. Although the statutory standard for determining if the accused in a pretrial detention hearing committed the charged offense is "substantial probability," D.C.Code 1973, § 23–1322(b)(2)(C), a higher standard than probable cause, it is nevertheless essentially an informed estimate of whether the government will prove the charge at trial and it does not require the fine determination of a reasonable doubt standard.

pellant as authority for an unconditional right to call adverse witnesses. In *Blunt*, the defendant argued that he was denied the constitutional right to cross-examine the witnesses who alleged he had threatened them. We noted that "[a] defendant has the right under the statute and under the case law to subpoena witnesses to appear *in his behalf*," *id.* 322 A.2d at 585 (emphasis added) (citing D.C.Code 1973, § 23–1322(c)(4); *Greenwell v. United States*, 115 U.S.App.D.C. 44, 317 F.2d 108 (1963)), but held that the defendant had "waived his right to cross-examine the government's witnesses when he neither availed himself of his right to call the witnesses nor asked the court for a continuance in order to secure their presence," *id.* 322 A.2d at 586. We had no occasion in *Blunt* to determine whether the accused's right to call witnesses in his favor may be conditioned upon a proffer showing how the testimony will negate substantial probability when the witness' testimony presumably will be *adverse* to the accused. *See In re R.D.S.*, D.C.App., 359 A.2d 136, 139 (1976) (respondent's right in a probable cause hearing to introduce evidence on his own behalf "does not connote the right to determine in effect who the government's witnesses shall be," and in order to compel the complainant's testimony, respondent must proffer how the evidence would negate probable cause).

### 2. Burden of Proof

▮ Appellant contends that the burden of proof required in a criminal trial, *i. e.*, proof beyond a reasonable doubt, *see In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), is the required standard under the dictates of procedural due process for a pretrial detention hearing. We cannot agree. The Supreme Court has consistently held that significant restraints on liberty may be imposed upon a finding of probable cause of a violation, including cases of parole violations, *Morrissey v. Brewer*, 408 U.S. at 485–89, 92 S.Ct. at

2602–04; probation violations, *Gagnon v. Scarpelli*, 411 U.S. at 782, 789, 93 S.Ct. at 1763; and pretrial detention, *Gerstein v. Pugh*, 420 U.S. at 119–21, 95 S.Ct. at 865–67. The statute requires that the judicial officer find by "a substantial probability" that the accused committed the offense for which he is charged. D.C.Code 1973, § 23–1322(b)(2)(C). The legislative history indicates that this standard, higher than probable cause was intended to be equivalent to the standard required "to secure a civil injunction—likelihood of success on the merits." H.R.Rep.No.91–907, 91st Cong., 2d Sess. 182 (1970).

*Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), is cited by appellant but actually lends support to our conclusion. In *Addington*, the Court rejected a burden of proof beyond a reasonable doubt for involuntary civil commitment hearings, requiring instead proof by clear and convincing evidence. The Court rejected the higher "beyond a reasonable doubt" standard because historically it has been reserved for criminal cases, which are punitive in purpose and for which our society has determined that "our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free." *Id.* at 428, 99 S.Ct. at 1810. These considerations also weigh against the imposition of the "reasonable doubt" standard on detention proceedings. As we conclude above, pretrial detention is not punitive in purpose. Our societal determination that the risk of error in a criminal trial be balanced in favor of the accused is closely tied to the punitive aspects of conviction and has no application to detention pending a trial at which the government will be required to meet the higher burden.

We find no constitutional infirmity in the statute on this score.

### C. Notice

▮ Advance notice of the specific allegations against the accused is a fundamental component of procedural due proc-

ess. Notice is necessary for the individual to understand the charges and the proceedings and to give him a meaningful opportunity "to marshal the facts in his defense." *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974). The pretrial detention statute does not contain any provision regarding notice but does provide for a continuance on the accused's motion which "shall not exceed five calendar days, unless there are extenuating circumstances." D.C.Code 1973, § 23–1322(c)(3). Appellant availed himself of a three-day continuance in the proceeding before Judge Norman.[43] Although appellant claims this was a constitutionally insufficient time to prepare, we find no merit in this contention. *See Gerstein v. Pugh,* 420 U.S. at 123–25 & nn. 24 & 25, 95 S.Ct. at 867–69 & nn. 24 & 25 (preliminary hearing for probable cause to be held immediately after presentment, or in conjunction with bail or pretrial release hearing); *Wolff v. McDonnell,* 418 U.S. at 564, 94 S.Ct. at 2978 (minimum 24 hours advance notice necessary for prison disciplinary hearing).

■ Appellant also acknowledges that he was provided adequate notice of the specific crimes charged for which he was arrested, but contends that he received inadequate notice of the specific instances of his "past and present conduct" upon which the government would rely to show his dangerousness to the community. *See* D.C. Code 1973, § 23–1322(b)(2)(B)(i). Appellant misperceives the character of the finding of dangerousness under § 23–1322(b)(2) required for pretrial detention. The judicial officer (here, Judge Norman) was not required to conduct a trial of each of the prior

offenses described in appellant's confession or to retry the adjudications of delinquency contained in appellant's social file. Rather, the judicial officer is to determine from the accused's "pattern of behavior consisting of his past and present conduct, and on the other factors set out in section 23–1321(b)," whether "there is no condition or combination of conditions of release which will reasonably assure the safety of any other person or the community." *Id.* The factors set out in § 23–1321(b), the statute governing pretrial release, include "the nature and circumstances of the offense charged, ... his family ties, employment, financial resources, character and mental conditions, *past conduct,* length of residence in the community, [and] *record of convictions* ...." *Id.* § 23–1321(b) (emphasis added). The judicial officer's task is thus qualitatively no different than, and in some aspects identical to, the determination at a bail hearing held immediately after an arrest to ascertain "which conditions of release, if any, will reasonably assure the appearance of a person as required or the safety of any other person or the community ...." *Id.* Nor is the inquiry significantly different from assessing whether a convicted defendant is dangerous or likely to flee, for purposes of determining his release pending appeal. *Id.* § 23–1325(c).[44]

Judge Norman relied upon the appellant's confession (to the offenses charged and seventeen robberies in the preceding four months), as corroborated by the testimony of the investigating officers, and upon the adjudications of delinquency in appellant's juvenile social file. With regard to the prior adjudications, appellant was put on notice by the statute that past convictions

---

**43.** He had previously obtained a three-day continuance in the case handled by Judge Bowers.

**44.** Unquestionably, there is no constitutional right to post-conviction bail. *Harris v. United States,* 404 U.S. 1232, 92 S.Ct. 10, 30 L.Ed.2d 25 (1971) (Douglas, J.); *Johnson v. United States,* D.C.App., 291 A.2d 697, 698 (1972); *see* 18 U.S.C. § 3148 (1976); D.C.Code 1973, § 23–1325; Duker, *supra* note 10, at 112–19. Having concluded that, likewise, there is no

constitutional right to pretrial bail, the deprivation of liberty through pretrial detention does not differ significantly from either detention in lieu of bail or the denial of bail pending appeal, as due process attaches to post-conviction denials of liberty interests. *See Morrissey v. Brewer, supra* (parole revocation); *Gagnon v. Scarpelli, supra* (probation revocation); *Wolff v. McDonnell, supra* (loss of good-time credits for prison disciplinary infraction).

would be considered in the determination of dangerousness. And, although counsel for appellant was given a copy of appellant's statement of confession only several hours prior to the commencement of the hearing, counsel had been present at a line-up held soon after appellant's arrest (and confession) in which some twenty-five witnesses were asked whether they were witnesses to or victims of assaults by appellant on particular dates at particular locations. Moreover, in the unique circumstances of the present case, whereby a hearing had been held a short time earlier on the government's first, but unsuccessful, motion for pretrial detention, counsel for appellant had more than usual notice regarding instances of appellant's past conduct, including access to appellant's juvenile social file. We find the notice to appellant constitutionally adequate.

### D. *Substantive Due Process, Vagueness, and Overbreadth*

Appellant also asserts that the pretrial detention statute violates substantive due process by denying bail pending trial and is both unconstitutionally vague and overbroad. These contentions have no merit and may be dismissed with little discussion.

#### 1. *Substantive Due Process*

■ Substantive due process requires that when "fundamental rights" are involved, the state may limit such rights by regulation only upon a showing of a "compelling state interest." *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Supreme Court has identified only a limited number of such "fundamental rights," such as the right to vote, the right to travel, the right to privacy concerning decisions of intimacy and procreation, as well as rights expressly guaranteed by the Constitution. *See Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Roe*

*v. Wade, supra; Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). *See generally* W. LaFave & A. Scott, Criminal Law § 20, at 138; L. Tribe, *supra* §§ 11–1 to –4.

■ Regardless of whether the right to bail is characterized as fundamental or not, the legislative history provides ample support for a compelling state interest in the pretrial detention of the narrow class of persons covered by the statute. Congress considered (1) the alarming increase in street crime in the District of Columbia since 1966; (2) statistical studies involving recidivism by persons while on pretrial release; (3) recommendations by the President's Commission on Crime in the District of Columbia (1966), and the Judicial Council Committee to Study the Operation of the Bail Reform Act in the District of Columbia (1969); and (4) pretrial release and detention practices in England and other countries. H.R.Rep.No.91–907, 91st Cong., 2d Sess. 87–94 (1970). Appellant attempts to litigate what are essentially legislative findings, *i. e.*, the extent of crime committed by persons released pending trial and the predictability of criminal conduct, citing studies which reached different statistical results [45] than those relied upon by Congress. These are matters properly committed to the legislative process. Pretrial detention clearly has a substantial relation to preventing injury to the public and thus falls within the scope of Congress' power to legislate for the District of Columbia. *See Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *United States v. Sharpnack*, 355 U.S. 286, 294, 78 S.Ct. 291, 296, 2 L.Ed.2d 282 (1958).

#### 2. *Overbreadth*

■ In support of his contention that the pretrial detention statute is imper-

---

**45.** *E. g.*, Note, *Preventive Detention: An Empirical Analysis*, 6 Harv.C.R.–C.L.L.Rev. 289 (1971).

missibly overbroad, appellant also cites statistical studies concluding that criminal conduct generally cannot be predicted. The doctrine of constitutional overbreadth applies to statutes that sweep unnecessarily broadly and thereby substantially impinge on constitutionally-protected conduct as well as conduct subject to governmental regulation. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Aptheker v. Secretary of State*, 378 U.S. 500, 508, 84 S.Ct. 1659, 1664, 12 L.Ed.2d 992 (1964); L. Tribe, *supra*, §§ 12–24 to –25. The doctrine has no application to the pretrial detention statute as it applies only to conduct which is constitutionally regulable, *i. e.*, the detainee must be charged with the commission of a dangerous crime, D.C.Code 1973, § 23–1322(a)(1), or a crime of violence, *id.* § 23–1322(a)(2), which the judicial officer finds with substantial probability was committed by the accused. Moreover, the statute also requires a finding that "there is no condition or combination of conditions of release which will reasonably assure the safety of any other person or the community," *id.* § 23–1322(b)(2), which thus prohibits pretrial detention if less restrictive alternatives are available in the individual case to effect the government's interest in protecting the community. Prediction of the likelihood of certain conduct necessarily involves a margin of error, but is an established component of our pretrial release system. Trial judges have been engaged in predicting the likelihood of flight for all defendants, capital and noncapital, and have predicted the likelihood of recidivism for capital offenses since the Judiciary Act of 1789. *See Wright v. United States*, D.C. App., 262 A.2d 350, 351, n.4 (1970); *Russell v. United States*, 131 U.S.App.D.C. 44, 402 F.2d 185 (1968). Appellant's argument relies on the assumptions, which we do not share, that the judicial prediction of dangerousness, as distinguished from the prediction of likelihood of flight, is both a denial of a fundamental right and the imposition of punishment. Accordingly, we decline to find the statute unconstitutionally overbroad.

### 3. Vagueness

▮▮▮▮▮ Appellant also asserts that the statute is impermissibly vague. The Supreme Court stated in *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939): "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Id.* at 453, 59 S.Ct. at 619 (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1925)). The statute is not tested in the abstract, however; vagueness challenges "must be examined in light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975), *quoted in Willcher v. United States*, D.C. App., 408 A.2d 67, 73 (1979). It is true that Congress left the meaning of "past conduct" supporting a finding of dangerousness under D.C.Code 1973, §§ 23–1321(b), –1322(b)(2)(B), to the sound judgment of the judicial officer, *see* H.R.Rep.No.91–1303, 91st Cong., 2d Sess. 240 (1970). However, the crimes with which appellant was charged and the crimes which he admits he committed in the space of four months preceding his arrest—a rape, a sodomy, two burglaries, and seventeen robberies—as well as the adjudication of his juvenile social file, are all prohibited conduct under concededly valid criminal laws.[46] Nor can there be any doubt as to the meaning of

---

**46.** Specifically, § 23–1331(3)–(4) of the D.C. Pretrial Detention Statute provides statutory definitions for "dangerous" and "violent" crimes.

Subsection 3 provides:

The term "dangerous crime" means (A) taking or attempting to take property from another by force or threat of force, (B) unlawfully entering or attempting to enter any premises adapted for overnight accommodation of persons or for carrying on business

"safety of the community" in this context. D.C.Code 1973, § 23–1322(1).

In sum, we hold that the challenged provisions of the District of Columbia pretrial detention statute, D.C.Code 1973, § 23–1322, are constitutional.[47]

## IV. CLOSURE

■ A collateral but important issue is left for our consideration. In each of the appellant's pretrial detention hearings, defense counsel moved for and was successful in obtaining at least partial closure of the hearings to the press and public. Because the court in each case failed to make any findings at all to support its conclusion that closure was necessary to preserve appellant's fair trial right, we reverse the court's rulings as violative of the First Amendment right of the press and public to attend courtroom proceedings.

Appellant contends that, despite an acknowledged, long-standing tradition of public trials and hearings, there is neither a common-law nor a constitutional right of the press or public to attend pretrial hearings. We cannot accept this contention. While certain aspects of pretrial hearings, including pretrial detention hearings, weigh heavily in favor of implementing protective procedures to safeguard a defendant's right to a fair trial, the necessity and scope of such procedures must be balanced against the interest of the press and public in open judicial proceedings.

In *United States v. Burka*, D.C.App., 289 A.2d 376 (1972), we recognized a common law right of access to judicial proceedings in holding that a trial judge may not sequester transcripts of proceedings from inspection by one of the parties because the proceeding itself was required to be public. In so holding, we noted that "[t]he general nature of our form of government requires the highest degree of public exposure to trial court proceedings," and that "the underlying policy firmly rooted in our judicial system [is] that courtroom proceedings must be public and open." *Id.* at 378 (footnote omitted). *See also ex parte Drawbaugh*, 2 App. D.C. 404 (1894) (patent registration litigation cannot be held in secret despite Patent Office rules preventing public disclosure in registration). If the government and *amicus* relied solely on this common law right of access, the balance of interests might weigh heavily in favor of appellant's right to a fair trial unjeopardized by prejudicial publicity, as guaranteed by the Fifth and Sixth Amendments. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The right of access to judicial proceedings also has a constitutional basis, however, requiring consideration of the balance between the two constitutional rights.

The Supreme Court recently made explicit that the constitutional guarantees of the First Amendment to freedom of speech and the press and the right to assemble encom-

with the intent to commit an offense therein, (C) arson or attempted arson of any premises adaptable for overnight accommodation of persons or for carrying on business, (D) forcible rape, or assault with intent to commit forcible rape, or (E) unlawful sale or distribution of a narcotic or depressant or stimulant drug (as defined by any Act of Congress) if the offense is punishable by imprisonment for more than one year.
Subsection 4 provides:
The term "crime of violence" means murder, forcible rape, carnal knowledge of a female under the age of sixteen, taking or attempting to take immoral, improper, or indecent liberties with a child under the age of sixteen years, mayhem, kidnaping, robbery, burglary, voluntary manslaughter, extortion

or blackmail accompanied by threats of violence, arson, assault with intent to commit any offense, assault with a dangerous weapon, or an attempt or conspiracy to commit any of the foregoing offenses as defined by any Act of Congress or any State law, if the offense is punishable by imprisonment for more than one year.

47. Contrary to the contention of Judge Ferren in his dissent, we do not purport to advise the legislative or executive branches of government on the constitutionality of a statute not before us. We only hold that the statute before us, with its "stricter standards"—to use his language—survives appellant's constitutional challenge.

pass a cognate right to attend criminal trials. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). In an earlier decision, a plurality of the Supreme Court had held that there is no independent Sixth Amendment right on the part of the public to attend *pretrial* hearings in which the defense, the government, and the court consent to closure. *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). The appellant and Judges Bowers and Norman relied on *Gannett* as sanctioning the closure of the pretrial detention hearings solely on appellant's motion. This reliance is misplaced. *Gannett* did not rule out the existence of a First Amendment public right of access to pretrial hearings, *see id.* at 392, 99 S.Ct. at 2911. Instead, the plurality opinion for the Court found that, assuming there was a First Amendment right of access, there was sufficient evidence in the record to support closure to protect the defendant's fair trial right. *Id.* at 392–93, 99 S.Ct. at 2911–12. A clear majority of the Court in *Gannett* would require, at a minimum, a showing by the defense that there exists a likelihood of pretrial publicity prejudicial to the accused's fair trial rights. *See id.* at 400, 99 S.Ct. at 2916 (Powell, J., concurring); *id.* at 441, 99 S.Ct. at 2937 (Blackmun, J., with Brennan, White & Marshall, JJ., concurring in part and dissenting in part) [hereinafter cited as (Blackmun, J., concurring and dissenting)]. Justice Powell based his decision on the First Amendment, while the Blackmun opinion relied on the Sixth Amendment without reaching the issue of a First Amendment right of access. *Id.* at 447, 99 S.Ct. at 2940. The concurring opinions in *Richmond Newspapers* of Justices White, 100 S.Ct. at 2830, and Brennan and Marshall, *id.* at 2832–39, accept the recognition of a First Amendment right of access to judicial proceedings while maintaining their position in *Gannett* that the more explicit public trial right of the Sixth Amendment also contains such a right of access. Because a majority of the Court in *Gannett* rejected the Sixth Amendment as

a basis for a right of public access, and consistent with the concurring and dissenting opinions in that case and with the Court's explicit holding in *Richmond Newspapers* that there is a First Amendment right of access to criminal trials, we conclude that the First Amendment provides a right of access to pretrial proceedings as well. The principles that support a right of access to trials apply with equal force to pretrial proceedings. While the possibility of prejudicial pretrial publicity is greater and the alternatives to closure more limited in the pretrial setting, these concerns are addressed by balancing the need for closure against the right of access, not by refusing to recognize such a right.

Public access to judicial proceedings serves an amalgam of functions, functions which are as applicable to critical pretrial hearings as to trials. *See Gannett Co. v. DePasquale,* 443 U.S. at 433–39, 99 S.Ct. at 2933–36 (Blackmun, J., concurring and dissenting) (pretrial suppression hearing is a critical proceeding implicating right of trial access). An open courtroom has an ameliorative effect on judicial proceedings themselves, by deterring perjury and thus protecting the integrity of the judicial process, *see id.* at 383, 99 S.Ct. at 2907, by inducing the unknown witnesses to come forward with relevant testimony and thus promoting the search for truth, *see id.,* by serving as a "restraint on possible abuse of judicial power," *In re Oliver,* 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948); *see United States v. Burka, supra ;* by guarding against misconduct by the police and prosecution, *Sheppard v. Maxwell, supra ;* and generally by "caus[ing] all trial participants to perform their duties more conscientiously," *Gannett Co. v. DePasquale,* 443 U.S. at 383, 99 S.Ct. at 2907. In addition to the ameliorative effect on the judicial process, openness and publicity perform an informative, educative function by enabling the public to observe the operation of the criminal justice system. *See Richmond Newspapers, Inc. v. Virginia,* 100 S.Ct. at 2824–25; *Gannett Co. v. DePasq-*

uale, 443 U.S. at 383, 99 S.Ct. at 2907; *id.* at 428–29, 99 S.Ct. at 2930–31 (Blackmun, J., concurring and dissenting). Related to the educative function is another purpose of open proceedings, promoting the appearance of justice, *see Richmond Newspapers, Inc. v. Virginia*, 100 S.Ct. at 2824–25; *Gannett Co. v. DePasquale*, 443 U.S. at 429, 99 S.Ct. at 2931 (Blackmun, J., concurring and dissenting), which promotes confidence in the fair administration of justice. Although the simplified procedures of the pretrial detention hearing distinguish it from a trial and arguably lessen the need for and impact on the evidentiary process that public scrutiny brings,[48] the educative and "sunshine" aspects of openness fully apply to pretrial detention. "Secret hearings— though they be scrupulously fair in reality—are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from the public view." *Id.* (quoting *United States v. Cianfrani*, 573 F.2d 835, 851 (3d Cir. 1978)). In the context of a constitutional challenge to a controversial pretrial detention process, the appropriateness of public scrutiny of such pretrial proceedings cannot be gainsaid.

Appellant argues, with some force, that special considerations apply with respect to the possibility of prejudicial publicity arising from pretrial detention hearings. Like other pretrial hearings, pretrial detention hearings may involve the disclosure of allegedly inadmissible evidence, such as statements of the accused or physical evidence seized by the police, which ultimately may be suppressed. In addition, the nature of the inquiry in a pretrial detention hearing, in examining whether the past and present conduct of the accused supports a finding that he is dangerous to the community, necessarily introduces evidence which will

be inadmissible at trial. Past arrests and convictions, highly relevant to the pretrial detention proceeding, are inadmissible at trial to show predisposition to commit the crime charged. *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). Likewise, the accused's juvenile convictions may be introduced at the pretrial detention hearing but by law are confidential. *See* D.C.Code 1973, §§ 16–2331, –2333. Not only does a pretrial detention hearing present an increased possibility of prejudicial publicity, appellant further argues, but some of the alternatives to closure are less desirable. For instance, as with other hearings held in advance of trial, sequestration of the jury is not an available alternative. *See Gannett Co. v. DePasquale*, 443 U.S. at 378–79, 99 S.Ct. at 2904–05. *But compare Commonwealth v. Hayes*, 489 Pa. 419, 414 A.2d 318, 324, *cert. denied*, —— U.S. ——, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980) (sequestration an available alternative to closure when suppression hearing scheduled to immediately precede trial). Change of venue is not available in the District of Columbia, *compare Nebraska Press Association v. Stuart*, 427 U.S. 539, 563–64, 96 S.Ct. 2791, 2804–05, 49 L.Ed.2d 683 (1976), and a continuance is a costly alternative where the defendant would waive the statutory requirement that a person ordered detained be tried within 60 days. D.C.Code 1973, § 23–1322(d)(2)(A).

▮ The increased possibility of prejudicial publicity and the limitation on alternatives are important considerations for a court confronted with a motion to close a pretrial proceeding. Nevertheless, the right of access of the press and the public to judicial proceedings mandates that the defendant make a showing and the court find, at a minimum, a likelihood that pretrial publicity will jeopardize the defendant's fair trial and that there are no "alternative means reasonably available by which the

---

48. *Compare Gannett Co. v. DePasquale*, 443 U.S. at 437, 99 S.Ct. at 2935 (Blackmun, J., concurring and dissenting) (probable cause

hearings, unlike pretrial suppression hearings, may be secret).

fairness of the trial might be preserved without interfering substantially with the public's interest" in open proceedings. *Gannett Co. v. DePasquale*, 443 U.S. at 400, 99 S.Ct. at 2916 (Powell, J., concurring); *see id.* at 440–42, 99 S.Ct. at 2936–38 (Blackmun, J., concurring and dissenting); *Nebraska Press Association v. Stuart*, 427 U.S. at 562–65, 96 S.Ct. at 2804–06. *Compare Richmond Newspapers, Inc. v. Virginia*, 100 S.Ct. at 2829–30 (in absence of any findings supporting closure or any inquiry regarding alternative solutions, closure order reversed).[49] Less burdensome alternatives, such as presenting the accused's juvenile file for *in camera* review by the court, must be considered before taking the ultimate step of barring the courtroom door to the press and the public.

The record here reflects that Judge Bowers conducted no inquiry concerning: (1) the likelihood of and nature of pretrial publicity; (2) its potential to jeopardize a fair trial for all parties; and (3) the available means by which a fair trial can be assured without resorting to closure. Judge Norman, after originally ordering complete closure, modified this order after hearing from counsel for The Washington Post.

Significantly, the record in these cases shows that the minimal publicity accompanying these proceedings was primarily generated by the unusual fact of the closure itself. And that is hardly surprising. The District of Columbia, the capital of the nation, is a major metropolitan center with a surfeit of events commanding media attention. Events occur, are reported, and pass with amazing rapidity. Trials relating to events of national and international news attention have been conducted without undue difficulty in obtaining a jury free from taint caused by such news attention. *See, e. g., Khaalis v. United States*, D.C.App.,

408 A.2d 313 (1979), *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980); *United States v. Haldeman*, 181 U.S.App. D.C. 254, 559 F.2d 31 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The strong presumption must be that in any case, jurors can be found in the District of Columbia whose exposure to the case will have been sufficiently minimal to enable them to render a fair and impartial verdict. Absent findings of fact based upon a showing clearly demonstrating that pretrial publicity will jeopardize the parties' right to a fair trial and that no alternative means are available to accord a fair trial without threatening the substantial public interest in open proceedings, it is error to order closure.

So ordered.

NEBEKER, Associate Judge, with whom Associate Judge HARRIS joins, concurring in part and dissenting in part:

While I join the Chief Judge's thorough analysis upholding the constitutionality of pretrial detention, I must dissent from the unoccasioned announcement by the court that the press has a First Amendment right to attend pretrial detention hearings. No court in the land, to my knowledge, has ever so ruled. This singularity, however, troubles me less than the knowledge that this proposal will find its way into history and the law books at the apparent behest of an amicus curiae, perhaps even to its surprise. In addition, we have not adequately considered the major premise of the majority. The opinion of the court relies significantly on *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), a case which was reported by the Supreme Court almost five weeks after argument in this case and our post-argument conference.

*DePasquale*, 443 U.S. at 371 n.1, 99 S.Ct. at 2901 n.1, where there had been extensive pretrial publicity in two local newspapers concerning the crime and the defendants' arrest, *see id.* at 371–74, 99 S.Ct. at 2901–03.

---

**49.** Justice Powell found sufficient evidence in the record in *Gannett* to support a finding that prejudicial publicity was likely to jeopardize the defendants' fair trial rights. The trial was to take place in a small town in a county with a total population of 34,000, see *Gannett Co. v.*

I

Although this portion of the court's decision will undoubtedly receive much attention, the chronicles of jurisprudence proclaim that this decision is an advisory one on a moot question rendered without jurisdiction for the hypothetical benefit of a corporation which is not even a party to the case.

The true issue has nothing to do with the First Amendment or *The Washington Post.* Before the court is the question of whether the government may veto the defendant's request to close his pretrial detention hearing to the public.[1] For reasons that appear below, I believe that even this question is incapable of review.

The elementary requirement of an actual case or controversy for the exercise of federal judicial power is imposed by Article III of the Constitution. This requirement is no less applicable to the District of Columbia court system. *District of Columbia v. Walters,* D.C.App., 319 A.2d 332, 338 n.13, *appeal dismissed,* 419 U.S. 1065, 95 S.Ct. 650, 42 L.Ed.2d 661 (1974); *United States v. Cummings,* D.C.App., 301 A.2d 229, 231 (1973). Furthermore, the party must have suffered some actual injury from the purportedly illegal action. *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). This injury must be attributable to a party against whom relief may be afforded. *Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–551, 7 L.Ed.2d 512 (1962). Without these criteria being met, no one can be relied upon to pursue the question in the adversary system. These criteria "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of

difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

These criteria, which have prevailed since the time of President Washington,[2] are wholly absent here in regard to the right of the press to attend pretrial detention hearings. The government has appealed the trial court's closure ruling in a cross appeal to defendant's constitutional challenge to the pretrial detention statute. While the government may arguably assert its quarrel with the conduct of the trial judge, it has no standing which entitles it to appellate review of a First Amendment issue. *Cf. Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 242, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). The government may not represent the First Amendment rights which are personal to others. *See Massachusetts v. Laird,* 400 U.S. 886, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 *reh. denied,* 346 U.S. 841, 74 S.Ct. 19, 98 L.Ed. 361 (1953); *Florida v. Mellon,* 273 U.S. 12, 47 S.Ct. 265, 71 L.Ed. 511 (1927); *Tyler v. Judges of the Court of Registration,* 179 U.S. 405, 407, 21 S.Ct. 206, 207, 45 L.Ed. 252 (1900); *cf. United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (federal statute grants standing to litigate Fifteenth Amendment rights). On the other side of the "case," the controversy collapses entirely when we consider the interest of the accused in the appeal. *See Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). He has no motive to oppose the government's appeal of the closure ruling. In support of this observation, I note that neither the government's counsel nor Edwards' counsel addressed himself to the closure issue at oral argument. Consequently, the court has issued an advisory

---

1. This question is no less perplexing than that which the majority opinion chooses to address. Only after conferring with his superiors did the Assistant United States Attorney decide to oppose the defendant's request for closure at the first hearing.

2. In 1793, President Washington sought the opinion of the Supreme Court on various matters arising under treaties with France. The Justices declined to respond because the questions were not posed within a particular controversy brought before them in legal form. *See United States v. Evans,* 213 U.S. 297, 301, 29 S.Ct. 507, 508, 53 L.Ed. 803 (1909).

opinion, remote from the interests of the parties before it. The necessary adverseness has been fabricated by the majority which seems to have an opinion and looks to this case as a vehicle to express it. We know little more about this First Amendment issue than we would if there were no case at all. *See Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972).

Neither can the requisite adversity be supplied by the presence on appeal of *The Washington Post* as amicus curiae. An amicus curiae is not a party to the action, does not in contemplation of law appear on behalf of anyone, may not control the litigation, *Givens v. Goldstein*, D.C.Mun.App., 52 A.2d 725 (1947); *Klein v. Liss*, D.C.Mun. App., 43 A.2d 757 (1945), and is not entitled to oral argument.[3] D.C.App.R. 29(b). Consequently, an amicus curiae is not entitled to any relief or ruling from the court in its favor and may not raise issues which are not properly asserted by the principal parties. *Givens, supra* 52 A.2d at 726. The First Amendment being personal to the amicus and irrelevant to the true issue

raised by the government, the court's attempted ruling is inappropriate and bootless.

The proper manner for *The Washington Post* to have asserted a First Amendment claim is established in numerous cases, some now notorious. The party seeking access to judicial proceedings must seek to intervene at the critical moment, *see Richmond Newspapers, supra; Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *United States v. Cianfrani*, 573 F.2d 835 (3d Cir. 1978); or seek an extraordinary writ against the trial judge. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *United States v. Sherman*, 581 F.2d 1358 (9th Cir. 1978); *Newspapers, Inc. v. Circuit Court for Milwaukee County*, 65 Wis.2d 66, 221 N.W.2d 894 (1974); *Gore Newspapers Co. v. Tyson*, 313 So.2d 777 (Fla.App.1975), *overruled by English v. McCrary*, 348 So.2d 293 (Fla.1977); *United Press Associations v. Valente*, 308 N.Y. 71, 140 N.Y.S.2d 71, 123 N.E.2d 777 (1954); *E. W. Scripps Co. v. Fulton*, 100 Ohio App. 157, 125 N.E.2d 896 (1955).[4]

---

3. An amicus curiae is a neutral party who appears to aid the court. Where one who seeks to appear as an amicus is advocating a position of one of the parties, this is inconsistent with the impartiality which clothes amicus curiae, and the court within its discretion may deny the application to appear as amicus. *Casey v. Male*, 63 N.J.Super. 255, 164 A.2d 374 (1960). Since the trial court permitted *The Washington Post* to be heard, we should assume that it did so on grounds consistent with the role of an amicus curiae; that is, the court sought information from *The Washington Post* as a friend of the court to better assist it in assessing the public interest in an open proceeding.

As a matter of law our disposition of the case should also be consistent with the role of an amicus. Therefore, we cannot consider the First Amendment question sought to be raised. The fact that the trial court allowed *The Washington Post* to be heard does not serve to make it a party on appeal. *Peckham v. Casalduc*, 261 F.2d 120 (1st Cir. 1958).

4. The opportunity for the press to be heard extends "no farther than the persons actually present at the time the motion for closure is made, for the alternative would require substantial delays in trial and pretrial proceedings

while notice was given to the public." *Gannett, supra* at 401, 99 S.Ct. at 2916 (Powell, J., concurring). *See also United States v. Schiavo*, 504 F.2d 1 (3d Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974). In *Schiavo*, the trial judge called representatives of the news media into the courtroom after one newsman had reported a matter which the judge had previously requested him not to report. In the courtroom, the judge then ordered the members of the press to refrain from reporting such matters under threat of contempt. The circuit court on review held that the order was appealable under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

In our case, there is no threatened contempt nor a docketed order of the trial court targeted at the press.

Compare *Schiavo* with *United States v. Sherman, supra*, in which the trial judge entered an order, after judgment of conviction, forbidding the press from speaking with members of the jury. The circuit court held that a particular newspaper lacked standing to appeal because it was not a party to the criminal action, but it could maintain an action for a writ of mandamus. That is also not the case before us today.

The Supreme Court of the United States has articulated the duty of the trial judge when confronted with a request to close a trial or a pretrial suppression hearing. The question of whether the court's duty is triggered when a defendant requests closure of pretrial detention proceedings and, if so, whether the trial judge has complied with that duty can only be argued in the context of mandamus or intervention by parties with opposing interests: the individual asserting his First Amendment right, the trial judge defending his exercise of judicial authority, or the defendant exercising his waiver of a public trial.

## II

A further problem, unaddressed by the parties or the majority opinion, is our jurisdiction to hear the government appeal. It is clear to me that we are without such jurisdiction. Although both the government and the defendant are authorized to appeal from a detention ruling, D.C. Code 1973, §§ 23–1324(b), –1324(d)(2), no statute authorizes the government to appeal from the trial court's closure ruling. Without such statutory authority we are unable to treat the issue raised by the government. *United States v. DiFrancesco,* —— U.S. ——, ——, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 568, 97 S.Ct. 1349, 1352, 51 L.Ed.2d 642 (1977); *Will v. United States,* 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *United States v. Jones,* D.C. App., 423 A.2d 193 (1980). *Cf. United*

*States v. Burka,* D.C.App., 289 A.2d 376 (1972) (government brought writ of mandamus to compel trial judge to turn over transcript in a criminal case). Mere consent of the parties to consideration by the court of an issue cannot, by itself, confer jurisdiction on the court. *Brown Shoe Co. v. United States,* 370 U.S. 294, 305, 82 S.Ct. 1502, 1512, 8 L.Ed.2d 510 (1962).

In addition, the trial court's action does not fall within the collateral order exception to the final judgment rule.[5] *See DiBella v. United States,* 369 U.S. 121, 126, 82 S.Ct. 654, 657, 7 L.Ed.2d 614 (1962). The primary reason that the exception does not apply in this case is that the government is not asserting a right that it enjoys. The Supreme Court has made it clear that defendants have a Sixth Amendment right to a public trial, *Gannett, supra,* and the public has a First Amendment right to attend a trial. *Richmond Newspapers, supra.* However, the suggested boundaries of the prosecutor's role in a closure request do not embrace similar rights. The plurality opinion in *Gannett* suggests that the public's interest in an open trial is protected by the litigants, the prosecutor acting as society's servant to defend both the interest of the public and the due process rights of the accused. *Gannett, supra* 443 U.S. at 383 and 384 n.12, 99 S.Ct. at 2907 and 2908 n.12. Justice Powell suggests that if the prosecutor joins in the closure request, he should "be given the opportunity to show that public access would interfere with (the State's) interests in fair proceedings or pre-

---

5. An order which does not terminate an action but which has the finality necessary for appeal must meet three criteria. (1) It must have a "final and irreparable effect on the *rights of the parties*" being "a final disposition of a claimed right." (2) It must be too important to be denied review. (3) The claimed right must not be an ingredient of the cause of action and must not require consideration along with it. *United States v. Ceferatti,* 91 U.S.App.D.C. 297, 300, 202 F.2d 13, 16 (1952), *cert. denied,* 345 U.S. 907, 73 S.Ct. 646, 97 L.Ed. 1343 (1953) (emphasis added); *see also United States v. Perkins,* 140 U.S.App.D.C. 76, 79, 433 F.2d 1182, 1185 (1970). One Supreme Court Justice

suggests that a closure order would not meet this test.

> The task of determining the application of these limitations [on a closure ruling] in each individual trial necessarily falls almost exclusively upon the trial court asked to exclude members of the press and public from the courtroom. For it would be entirely impractical to require criminal proceedings to cease while appellate courts were afforded an opportunity to review a trial court's decision to close proceedings. [*Gannett, supra,* 443 U.S at 398, 99 S.Ct. at 2915 (Powell, J., concurring).]

serving the confidentiality of sensitive information." *Id.* 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring). The dissenting Justices, however, strenuously object to this characterization of the prosecutor's role. They "reject any notion that the decision whether to permit closure should be in the hands of the prosecutor on the theory that he is the representative of the public interest." *Id.* at 445, 99 S.Ct. at 2939 (Blackmun, J., concurring and dissenting in part).

Furthermore, the defendant's waiver of his right to a public trial does not harm the government *per se.* Therefore, let he whose interest in a public trial is seriously jeopardized by closure, appear, intervene, and litigate his rights. This is not the government's role and, consequently, no such appeal should lie in this case.[6]

In this case there are serious matters that have passed unexamined prior to the court's decision. For example, some jurists question the majority's blithe assumption that "[t]he principles that support a right to access to trials apply with equal force to pretrial proceedings," Chief Justice Burger among them. In his concurring opinion in *Gannett, supra* at 396, 99 S.Ct. at 2914, the Chief Justice wrote "no one ever suggested that there was any 'right' of the public to be present at such pretrial proceedings as were available" at the founding of our country.

The majority also assumes that a whole litany of functions served by a public proceeding applies to detention hearings. *See ante* at 1344–1345. I suggest that several are wholly irrelevant and most are debatable. These matters are better left to careful factfinding and judicial scrutiny which the adversary process is designed to provide.

Taken together, the views of the various Justices in *Gannett*, which I discuss *supra* at 1349–1350, do not support a prosecutorial right to veto a closure order granted at the request of the defendant, even if the trial judge has failed to consider the public interest in an open proceeding and less restrictive alternatives to closure. At best, the prosecutor may insist that the request for closure be consistent with the actual wishes of the accused. But the government may not appeal on behalf of the public when the defendant has waived his right to public trial. Indeed, permitting a government appeal is inconsistent with the prosecutor's duty to assure the swift and sure administration of justice. The public interest and the prosecutor's duty are never assertedly symbiotic. *See Gannett, supra.* If the government should win such an appeal, *pendente lite*, a subsequent conviction would be subject to direct attack by the defendant on the grounds that he was prejudiced by a denial of his due process rights. *See id.* at 438–39, 99 S.Ct. at 2935–36 (Blackmun, J., concurring and dissenting in part).

I submit we have no case involving closure; the court has decided an argument weakly put. Part IV, therefore, should be viewed as a nullity.

FERREN, *Associate Judge,* concurring in part and dissenting in part:

After devoting so much attention to the Eighth Amendment, this court lowered its

---

**6.** Similarly, the case is not one for which an exception to the mootness doctrine applies. *See ante* at 1324 n.2. The key to granting an exception is the existence of a *right* which the government seeks to procure by suit or which a private person seeks to protect from government action. *See Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Dobbs v. Neverson*, D.C. App., 393 A.2d 147, 155 n.14 (1978). As I have indicated, the government has no right to assert at all, and *The Washington Post* is not a party to the action. *Cf. Richmond Newspapers, supra; Gannett, supra.*

In *Nebraska Press Assoc. v. Stuart, supra*, the Court held that the issue of whether a trial judge could restrain reporting by the news media was not moot because the defendant's conviction was under appeal to the Nebraska Supreme Court and a new trial could be ordered. Such is not the case here since Edwards has pleaded guilty.

sights on the second, equally important issue concerning bail: Fifth Amendment due process. While I concur in Chief Judge NEWMAN'S Eighth Amendment analysis in Part II of his opinion for the court, I cannot accept his treatment of due process in Part III.

## I.

Specifically, this court confronts the question whether the Eighth Amendment guarantees a right to bail to every person accused of a noncapital crime. We hold that it does not. We rule that the right to bail, as such, is a matter for the legislature, and that the bail protection clause of the Eighth Amendment is directed to the courts: a judge may not impose "excessive bail" in cases the legislature deems bailable. All the more important, therefore, is the question whether an accused has other constitutional protections in the event the legislature authorizes pretrial detention without bail. We answer yes, holding that Fifth Amendment due process constrains the legislature and the committing magistrate. We then apply due process and sustain both the validity of the pretrial detention statute, D.C.Code 1973, § 23–1322,[1] and its use to detain appellant Edwards.

Although I agree that § 23–1322 is constitutional when properly interpreted and applied, I respectfully dissent because I perceive a looseness of analysis that could lead to misunderstandings of due process in the future. I have three concerns.

First, as to the government's burden of proof, the majority upholds the statute with an analysis that strongly hints the protections afforded the defendant in § 23–1322 are *higher* than they need to be. More specifically, by premising their analysis primarily on *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), my colleagues apparently would permit pretrial detention without right to bail *merely on findings of probable cause* to believe that (1) an accused, "charged with a dangerous crime," has "committed the offense" and that (2) no condition of pretrial release "will reasonably assure the safety of the community," given the accused's "past and present conduct." D.C. Code 1973, §§ 23–1322(a)(2), (b)(2); *see ante* at 1339–1340. In contrast, I believe due process mandates the much stricter requirement, contained in the statute, that the findings be premised on clear and convincing evidence.

Second, as to the defendant's right to confront adverse witnesses, the majority interprets the statute in a way that affords *lower* protections than the Constitution, I believe, requires. According to the majority, the government can accomplish pretrial detention, consistent with due process, solely on the basis of proffer or other hearsay evidence "subject to the discretion of the judge as to the nature of the proffer and the need for admissible evidence." *Ante* at 1337. Thus, in effect, unless the accused sustains the burden of casting doubt on the sufficiency of the government's proffer, the accused at this stage has no right to confront and cross-examine any government witness. To the contrary, I believe the Constitution entitles the accused to confront and cross-examine every witness whose testimony the government intends to proffer, unless the government sustains the burden of showing good cause why the witness should not be called.

Third, in declining to rule on the notice issue in the case before Judge Bowers, my colleagues leave doubts about that important due process right. *See ante* at 1339–1341. I believe it must be made clear that due process entitles the accused to notice of all the charges about past and present conduct he or she will face at the pretrial detention hearing.

It affronts our constitutional heritage to say that due process is satisfied when an

---

1. The District of Columbia pretrial detention statute, D.C. Code 1973, § 23–1322, is reproduced in the Appendix to this opinion. Related definitional provisions, *id.* §§ 23–1311(3)–(4), also are included.

accused can be held for two months in jail, without right to bail, based on procedures as one-sided and findings as flimsy as those the majority apparently would permit. In my view, the very strictness of the statute is its salvation; in fact, elementary notions of due process require judicial amplification of the statute in the three critical respects where the majority is lax.[2]

As a consequence, I dissent from reversal in the rape case, No. 80–294; I would affirm Judge Bowers' order denying the government's first application for detention. I concur, however, in the result reached in the burglary case, No. 80–401; I would affirm Judge Norman's pretrial detention order.

### II.

The majority principally relies on *Gerstein, supra*, a Fourth Amendment case, for analysis of due process, properly a Fifth Amendment concern. By doing so, my colleagues afford less constitutional protection to an accused at a pretrial detention hearing than the Supreme Court has granted convicted felons facing possible revocation of probation or parole. *See Gagnon v. Scar-pelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1759, 36 L.Ed.2d 656 (1973) (probation); *Morrissey v. Brewer*, 408 U.S. 471, 484–89, 92 S.Ct. 2593, 2601–04, 33 L.Ed.2d 484 (1972) (parole). That is not the law.

In *Gerstein, supra*, the Supreme Court considered "whether a person arrested and held for trial under a prosecutor's information is constitutionally entitled to a judicial determination of probable cause for pretrial restraint of liberty." *Id.* 420 U.S. at 105, 95 S.Ct. at 858. Under state criminal procedure, the government had to bring every person arrested before a judicial officer within 24 hours, but the magistrate made no determination of probable cause to believe the suspect had committed a crime. *Id.* 420 U.S. at 109. The Court held that "the prosecutor's assessment of probable cause is not sufficient alone to justify restraint of liberty pending trial," *id.* at 118–19, 95 S.Ct. at 865–66; rather, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114, 95 S.Ct. at 863. The Court stressed: "[W]e limit our holding to the precise requirement of the Fourth Amendment...." *Id.* at 123, 95 S.Ct. at

---

**2.** As to Part III.D. of the majority opinion, I agree that the pretrial detention statute offends no principle of substantive due process. *Ante* at 1341. I also agree that the statute, as applied to appellant, is not overbroad (typically a First Amendment concern). *See Broadrick v. Oklahoma*, 413 U.S. 601, 613–15, 93 S.Ct. 2908, 2916–18, 37 L.Ed.2d 830 (1973); *ante* at 1341–1342. Nor does the law create an irrational classification that violates the equal protection aspect of Fifth Amendment due process. *See Estate of French v. Doyle*, D.C.App., 365 A.2d 621, 623–24 (1976), *appeal dismissed sub nom. Key v. Doyle*, 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977); *ante* at 1342. Finally, although I agree with the majority that the pretrial detention statute is not void for vagueness as applied to appellant, *ante* at 1342–1343, our decision does leave open the possibility of a constitutional attack on grounds of vagueness of § 23–1322 as applied to a defendant for whom the prediction of dangerousness is premised on "past and present conduct" of a sort less conclusive than the conduct of appellant Edwards. *See Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939).

I also concur in Part IV. of the majority opinion on closure of the courtroom. I disagree with Judge NEBEKER's statement that the government "has no standing which entitles it to appellate review of a First Amendment issue." *Ante* at 1348. Although "the institutional press is the likely, and fitting, chief beneficiary of a right of access because it serves as the 'agent' of interested citizens," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 2832 n.2, 65 L.Ed.2d 973 (1980) (Brennan, J., with Marshall, J., concurring in the judgment), it is also true that "[t]he responsibility of the prosecutor as a representative of the public surely encompasses a duty to protect the societal interest in an open trial." *Gannett Co. v. DePasquale*, 443 U.S. 368, 384 n.12, 99 S.Ct. 2898, 2908, n.12, 61 L.Ed.2d 608 (1979). Furthermore, contrary to Judge NEBEKER's view, *see ante* at 1349, I conclude that the closure issue is properly before us through an appealable collateral order. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949).

867. Justice Stewart, joined by three others, concurred separately to emphasize that limitation. *See id.* at 127, 95 S.Ct. at 869 (Stewart, J., with Douglas, Brennan & Marshall, JJ., concurring).

For three reasons I believe my colleagues' heavy reliance on *Gerstein* is misplaced. First, the decision to hold an accused without bail is an entirely different determination from the probable cause finding *Gerstein* requires before the court may impose any significant pretrial restraint on liberty. *See id.* at 125, 95 S.Ct. at 868. A probable cause finding under *Gerstein* relates solely to the question whether there is reasonable ground to believe the accused committed a crime. It is the test traditionally applied at "only the *first* stage" of the criminal justice system, *id.* at 125 n.27, 95 S.Ct. at 868 n.27, to justify pretrial restraint no greater than the setting of bail. *See id.* at 114, 95 S.Ct. at 863. Indeed, probable cause is the standard used upon arraignment to hold the accused for a separate pretrial detention hearing up to five days later. *See* D.C. Code 1973, § 23–1322(c)(3). In contrast, pretrial detention without bail is premised not only on a showing that the accused may have committed a particular crime, but also on a far more complex, inherently speculative prediction that the accused is likely to be dangerous in the future, based on past and present conduct. This kind of evaluation was not before the court in *Gerstein* and, given its predictive nature, requires a more carefully focused, Fifth Amendment analysis.[3]

Second, four years after *Gerstein*, the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), held that the government's needs for effective prison management and institutional security were "regulatory" purposes valid enough to justify uncomfortable, even offensive, jail conditions for pretrial detainees without offending due process. *See id.* at 540, 544–48, 99 S.Ct. at 1876–79. Such conditions, accordingly, could not be called "punishment," even though they ranged, for example, from double-bunking to visual inspections of the inmates' anal and genital cavities every time they had received outside visitors. *See id.* at 540–60, 99 S.Ct. at 1874–85. Citing *Gerstein*, the Court assumed the detention itself (which the appellants had not challenged) was valid, based on a finding of probable cause coupled with bail set to prevent flight. *See id.* at 536, 99 S.Ct. at 1872. The Court stressed that it had "no occasion to consider whether other governmental objectives may constitutionally justify pretrial detention." *Id.* at 534 n.15, 99 S.Ct. at 1871 n.15. While the Court took no position on pretrial detention without bail, the statement reflects the Court's recognition that no-bail detention is a serious, separate issue.

Finally, the Supreme Court has emphasized that "due process is flexible and calls for such protections as the particular situation demands." *Morrissey, supra* 408 U.S. at 481, 92 S.Ct. at 2600. A year after *Gerstein*, in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (a decision permitting a prehearing cut-off of Social Security disability benefits), the Court outlined three considerations applicable to due process in every context:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

---

3. In *Gerstein, supra* 420 U.S. at 125 n.27, 95 S.Ct. at 868 n.27, in response to Justice Stewart's concurring opinion, the Court called the probable cause determination a "threshold right," emphasized the historical application of the Fourth Amendment in the criminal process, and added that the Fourth Amendment's "balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial." Pretrial detention without bail, however, is not part of this traditional criminal process (except in connection with capital crimes). *See* D.C. Code 1973, §§ 23–1321, –1325(a), and the Court's dicta does not foreclose Fifth Amendment analysis.

additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See, e. g., Goldberg v. Kelly, supra,* 397 U.S. at 263–271, 90 S.Ct. at 1018–1022.

See *Greenholtz v. Inmates of the Nebraksa Penal & Correctional Complex,* 442 U.S. 1, 12–13, 99 S.Ct. 2100, 2106–2107, 60 L.Ed.2d 668 (1979); *In re Kossow,* D.C.App., 393 A.2d 97, 104 (1978). I perceive no legitimate way for the majority to ignore this basic interest analysis in favor of a unique *Gerstein* shortcut.

In summary, *Gerstein* mandates at least a judicial finding of probable cause before imposing any extended pretrial restraint, including a "five-day hold" for a pretrial detention hearing; *Bell* permits pretrial confinement short of "punishment" on the assumption that the detention itself is valid; and *Mathews* requires a distinct, three-part analysis for every context in which the government would impinge on constitutionally protected private interests. There is, accordingly, a gulf between an initial finding of probable cause under *Gerstein* and an approval of pretrial jail conditions under *Bell*—a gulf that can be bridged only by a *Mathews* analysis of the pretrial detention statute, on its face and as applied.

### III.

In applying due process to probation and parole revocation, the Supreme Court imposed certain procedural safeguards to protect conditional liberty. *See Gagnon, supra* 411 U.S. at 782, 93 S.Ct. at 1759; *Morrissey, supra* 408 U.S. at 484–89, 92 S.Ct. at 2601–04. "*A fortiori,* pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell, supra* 441 U.S. at 545, 99 S.Ct. at 1877. By apparently providing pretrial detainees with *less* protection than probationers and parolees receive (as we shall see), the majority has set the constitutional hurdle for pretrial detention decidedly too low.

### A. The Liberty Interest of the Potential Detainee

All parties—and all judges of this court—agree: pretrial detention affects a clear and vital liberty interest. Indeed, "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz, supra* 442 U.S. at 18, 99 S.Ct. at 2109 (Powell, J., concurring in part and dissenting in part).[4] Pretrial liberty is all the more precious because constitutional protection drops off sharply once pretrial detention is properly imposed. At that point, due process bars only "punishment," a term the Supreme Court now defines by reference to the government's purpose, not to impact on the accused. *See Bell, supra,* 441 U.S. at 538, 99 S.Ct. at 1873. An accused, therefore, may have to live in a grim prison environment for months and months before trial, *see Bell, supra* 441 U.S. at 541–43, 548–60, 99 S.Ct. at 1875–76, 1879–85, shielded

---

4. Some will maintain that this pretrial liberty interest is derived, self-evidently, from explicit recognition of "liberty" in the Fifth Amendment. *See Bell, supra* 441 U.S. at 580, 99 S.Ct. at 1895 (Stevens, J., with Brennan, J., dissenting); *Meachum v. Fano,* 427 U.S. 215, 230, 96 S.Ct. 2532, 2541, 49 L.Ed.2d 451 (1976) (Stevens, J., with Brennan & Marshall, JJ., dissenting). The Eighth Amendment also reflects a deep constitutional concern that imprisonment before trial is a substantial deprivation of liberty. *See Stack v. Boyle,* 342 U.S. 1, 4–5, 72 S.Ct. 1, 3–4, 96 L.Ed. 3 (1951). Others, however, will characterize the pretrial liberty interest as a creation of positive law reflected in the bail statute's rebuttable presumption of "release[ ] pending trial on ... personal recognizance or upon the execution of an unsecured appearance bond." D.C. Code 1973, § 23–1321(a) (reproduced in the Appendix); *see Greenholtz, supra* 442 U.S. at 12, 99 S.Ct. at 2106 (majority opinion). Whatever the source, Constitution or statute, the interest of every person accused of crime in liberty before trial—before conviction of any wrong—is of the highest order.

against only egregious delays by "speedy trial" guarantees. *See Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972); *United States v. Marion*, 404 U.S. 307, 315 n.8, 318 n.9, 319, 324, 92 S.Ct. 455, 460 n.8, 462 n.9, 462, 465, 30 L.Ed.2d 468 (1971).

Although not necessarily "punishment," *but see* note 12 *infra,* pretrial detention is likely to have substantially the same, painful impact on the individual as incarceration for a criminal offense. *See Campbell v. McGruder*, 188 U.S.App.D.C. 258, 267, 580 F.2d 521, 530 (1978). The accused is likely to lose employment, strain relationships with family and friends, and suffer indignities of the sorts already described; but, of even greater significance, a number of studies indicate that "the defendant at liberty pending trial stands a better chance of not being convicted or, if convicted, of not receiving a prison sentence." Ares, Rankin & Sturz, *The Manhattan Bail Project: An Interim Report on the Use of Pre-Trial Parole,* 38 N.Y.U.L.Rev. 67, 86 (1963); *see McGinnis v. Royster,* 410 U.S. 263, 281–83, 93 S.Ct. 1055, 1065–66, 35 L.Ed.2d 282 (1973) (Douglas, J., with Marshall, J., dissenting); *Campbell, supra* 188 U.S.App.D.C. at 268–69, 580 F.2d at 531–32; Vera Institute of Justice, Programs in Criminal Jus-

tice Reform: Ten-Year Report 1961–1971, at 31 (1972). This disparity may be attributable to "[c]onditions of confinement that impede a defendant's preparation of his defense (apart, of course, from the fact of confinement itself), or that are so harsh or intolerable as to induce him to plead guilty, or that damage his appearance or mental alertness at trial." *Campbell, supra,* 188 U.S.App.D.C. at 269, 580 F.2d at 532.

To say the very least, an accused has a substantial interest in not being arbitrarily classified as dangerous, and thus nonbailable as a matter of law.[5]

### B. *The Interests of the Government (the Public)*

The public has two principal interests in the availability of pretrial detention: (1) the need to ensure that the defendant appears at trial, *see Stack v. Boyle,* 342 U.S. 1, 4–5, 72 S.Ct. 1, 3–4, 96 L.Ed. 3 (1951); *Jones v. United States,* D.C.App., 347 A.2d 399, 401 (1975); *Villines v. United States,* D.C. App., 312 A.2d 304, 306 (1973); D.C. Code 1973, § 23–1321(a) (reproduced in the Appendix), and (2) the need to protect society against dangerous individuals who may continue to commit serious crimes while other charges are pending. *See Jones, supra,* 347 A.2d at 401; D.C. Code 1973, § 23–1321(a).[6]

---

**5.** The right to bail, of course, is often illusory. It is true that "under our local bail provisions ... money bond may not be used to assure detention," *Villines v. United States,* D.C.App., 312 A.2d 304, 306 (1973), and that bail accordingly "may be used only to prevent flight of the appellant or to assure his appearance for trial." *Jones v. United States,* D.C.App., 347 A.2d 399, 401 (1975); *accord, Villines, supra* 312 A.2d at 306; *see* D.C. Code 1973, § 23–1321(a). Nonetheless, even when not constitutionally excessive, bail in fact may be set too high for the accused to afford. *See, e. g., Villines, supra* at 305. Not uncommonly, an accused remains incarcerated before trial for months because of an unaffordable right to bail, coupled with uncorrectable congestion in the courts (it is said) and other systemic delays falling short of Sixth Amendment speedy trial violations. *See, e. g., United States v. Calhoun,* D.C.App., 363 A.2d 277, 278–82 (1976); *United States v. Jones,* D.C.App., 254 A.2d 412, 414 (1969). While it is true that under the pretrial detention statute

failure to bring the accused to trial within 60 days generally results in the automatic right to bail, not dismissal of the indictment, *see* D.C. Code 1973, § 23–1322(d)(2)(A), there nonetheless is every incentive for the government to bring the trial with dispatch. *See id.* §23–1322(d)(1). As a practical matter, therefore, the pretrial detention statute may afford greater protection of liberty, in some instances, than the statutory right to bail, *id.* § 23–1321, coupled with the Sixth Amendment right to a speedy trial. *See Barker, supra* 407 U.S. at 530, 92 S.Ct. at 2191. The deficiencies in the bail and court systems, however, coupled with the statutory impetus to a speedy trial under § 23–1322, cannot properly serve to undermine the importance of the right to bail. Any impediment to its exercise should be no excuse for its compromise.

**6.** *Cf. Vitek v. Jones,* 445 U.S. 480, 495, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (state has interest in segregating and treating mental-

The government also has an efficiency interest in not having to make two substantially similar, extensive presentations: one for pretrial detention, the other at trial itself. *Cf. Morrissey, supra* 408 U.S. at 483, 92 S.Ct. at 2601 (state has interest in being able to return parole violator to prison without burden of new adversary criminal trial). This interest in avoiding, in effect, two trials is even greater when government witnesses might suffer severe emotional trauma (as alleged in this case) if they had to testify twice as to brutal treatment by the defendant.

On the other hand, as strong as the government's interests may be in having available a manageable pretrial detention system, the government has a countervailing interest in assuring basic fairness, including accuracy of findings—in short, an interest in not imprisoning anyone unnecessarily. *Greenholtz, supra* 442 U.S. at 13, 99 S.Ct. at 2107; *Gagnon, supra* 411 U.S. at 785, 93 S.Ct. at 1761; *Morrissey, supra* 408 U.S. at 484, 92 S.Ct. at 2601.

C. *The Risk of Error from the Procedures Used; Probable Value of Additional or Substitute Safeguards*

Pretrial detention under § 23–1322 inherently involves a substantial risk of error. Like parole and probation decisions, pretrial detention requires a predictive judgment about future conduct that depends on imperfect evaluative techniques. *See Greenholtz, supra* 442 U.S. at 8, 13, 99 S.Ct. at 2104, 2107; *Morrissey, supra,* 408 U.S. at 480, 92 S.Ct. at 2599. The Supreme Court repeatedly has recognized the risk of error in similar determinations. *See, e. g., Vitek v. Jones,* 445 U.S. 480, 495, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980); *Greenholtz,*

*supra,* 442 U.S. at 13, 99 S.Ct. at 2107; *Addington v. Texas,* 441 U.S. 418, 426–27, 99 S.Ct. at 1809–10 (1979); *Morrissey, supra,* 408 U.S. at 484, 92 S.Ct. at 2601. *See generally* Note, *Preventive Detention: An Empirical Analysis,* 6 Harv.C.R.–C.L.L.Rev. 289 (1971). Under my colleagues' position on due process, however, "the risk of an erroneous deprivation" of liberty, *Mathews, supra* 424 U.S. at 335, 96 S.Ct. at 903, is enormous. Given the private and public interests involved, coupled with the substantial risk of error, I conclude that the Fifth Amendment demands are considerable. In my view, the statute cannot survive constitutional scrutiny unless it contains— by word or imputation—three additional safeguards which, taken together, will make the risk of error acceptably low.

1. *Notice*

The majority's discussion of the right to notice, *ante* at 1339–1341, is incomplete. Any person accused of a "dangerous crime" needs to know the precise instances of "past and present conduct" on which the government proposes to rely to demonstrate a threat to the community. D.C. Code 1973, § 23–1322(a)(1), (b)(2)(B). Timely notice is vital if the accused is to have a meaningful opportunity to defend at the pretrial detention hearing. Even when lesser liberty interests are at stake, the Supreme Court has held that notice of the specific charge is essential to due process. *See Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974) (prison disciplinary proceeding); *Gagnon, supra,* 411 U.S. at 782, 93 S.Ct. at 1759 (probation revocation); *Morrissey, supra,* 408 U.S. at 486–87, 92 S.Ct. at 2602–03 (parole revocation); *cf. Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970)

---

ly ill prisoners); *Addington v. Texas,* 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) (state has interest in protecting community from dangerous tendencies of some who are mentally ill); *Gagnon, supra,* 411 U.S. at

785, 93 S.Ct. at 1761 (state has interest in not prejudicing safety of community through parole and probation decisions); *Morrissey, supra* 408 U.S. at 483, 92 S.Ct. at 2601 (state has

(notice required before preliminary suspension of welfare benefits).[7]

Furthermore, the government has no interest in declining to reveal the charges it will allege at the hearing, although the expedited nature of the proceeding naturally will preclude notice much in advance. *See Greenholtz, supra,* 442 U.S. at 14 n.6, 99 S.Ct. at 2107 n.6; *Wolff, supra,* 418 U.S. at 564, 94 S.Ct. at 2978; *Goldberg, supra* 397 U.S. at 267–68, 90 S.Ct. at 1020–21. Because the accused is held pending the hearing, however, the government ordinarily will not have a strong interest in denying a defense continuance [8] if the accused wants additional time to evaluate the government's allegations. I conclude that due process requires the right to advance (even if short) notice of all charges, facilitated by the right to a reasonable continuance. The statute should be so interpreted.

### 2. *Confrontation and Cross-Examination*

With an exception not applicable here, the pretrial detention statute provides that no person shall be ordered detained unless "on the basis of information presented by proffer or otherwise to the judicial officer there is a substantial probability that the person committed the offense . . . ." D.C. Code 1973, § 23–1322(b)(2)(C). My colleagues interpret the statute to say the government as a general rule may use proffer and other hearsay testimony to establish sufficient support for the findings required under § 23–1322, subject to the trial court's discretion to require better proof, ~~presumably at the defendant's require better proof~~, presumably at the defendant's urging. *See ante* at 1337–1339. I disagree. To save the constitutionality of the statute, I would establish the opposite presumption by interpreting § 23–1322 to grant the accused the right, as a general rule, to confront and cross-examine those individuals who have provided adverse information. Thus, I would allow the government to proceed by proffer or hearsay only when it can show good cause why a witness should not be called to give live testimony.

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg, supra* 397 U.S. at 269, 90 S.Ct. at 1021. Although the pretrial detention hearing does not necessitate the comprehensive examination of witnesses required when the court or the jury must resolve guilt or innocence, credibility and veracity remain at issue. In *Goldberg,* for example, the Court held that even the temporary loss of welfare benefits pending a more complete hearing was severe enough to require confrontation rights. *See id.* at 270, 90 S.Ct. at 1021. In the case of pretrial detention, where the accused has so much more at stake, I do not believe we should downplay such a basic, due process right—as the majority does—by presumptively authorizing proffer and other hearsay to sustain the necessary showing.

The public's interest in pretrial detention, however, on occasion will justify an exception to the general right of confrontation. In *Morrissey, supra,* although recognizing that individuals faced with preliminary revocation of parole have a basic confrontation right, the Supreme Court articulated a limitation: when "the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confron-

interest in being able to return to prison parolee who commits antisocial acts).

**7.** *But cf. Vitek, supra,* 445 U.S. at 494–96, 100 S.Ct. at 1264–65 (written notice of contemplated transfer from prison to mental hospital, followed by hearing at which authorities disclose evidence relied on for transfer, satisfies due process).

**8.** Under the statute the accused is entitled to a continuance of up to five days—and even longer, in the court's discretion, if "there are extenuating circumstances." D.C. Code 1973, § 23–1322(c)(3).

tation and cross-examination." *Id.* 408 U.S. at 487, 92 S.Ct. at 2603; *see Vitek, supra* 445 U.S. at 494–96, 100 S.Ct. at 1264–65.[9] Thus, concerns for the safety or well-being of government witnesses and their ability to testify both before and at trial dictate a similar limitation for pretrial detention hearings. If, for example, the government can present evidence, such as a doctor's testimony, that a rape victim would suffer emotional harm when forced to testify so soon after the event, this reason probably should suffice to justify a proffer of her testimony instead.

In summary, I would follow the Court's approach in *Morrissey, supra,* and announce as a general rule the right of the defense to confront and cross-examine all government witnesses essential to the case for detention, *see id.* 408 U.S. at 487, 489, 92 S.Ct. at 2603, 2604, except that the government may proceed instead by proffer if it can show "good cause" (as in the example given above) why it should not call the witness personally. *Id.* at 489, 92 S.Ct. at 2604;

accord, *Vitek, supra* 445 U.S. at 495–96, 100 S.Ct. at 1264–65.[10] I believe this suggested approach to confrontation and cross-examination is sufficiently compatible with a statute requiring "information presented by proffer or otherwise" to save its constitutionality if so construed.[11]

### 3. The Burden of Proof

Although a close question, I agree that pretrial detention without bail for 60 days (or somewhat longer if the accused asks for a continuance) is not "punishment," as defined in *Bell, supra,* 441 U.S. at 535–39, 99 S.Ct. at 1872–74, and *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 6 L.Ed.2d ·644 (1963). The government has a valid regulatory purpose in protecting the community against a predictably dangerous person during the period the government needs to prepare for trial.[12] All the safeguards of a criminal trial, moreover, will follow detention within a reasonably short period of time. *See* note 12 *supra.* Accordingly, I conclude that at a

---

**9.** *Cf. Wolff, supra* 418 U.S. at 566–69, 94 S.Ct. at 2979–81 (inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence when not unduly hazardous to institutional safety or correctional goals; due process does not require rights of confrontation and cross-examination of adverse witnesses).

**10.** Conceivably, the government, on occasion, may be able to establish its case for pretrial detention without calling or even proffering its principal witnesses. If, for example, the government can present a defendant's confession (absent evidence of coercion) that is sufficiently reliable to establish the required substantial probability of committing the charged offense, the government may not be required to call or proffer the complaining witness to testify at the detention hearing. It is important to add, however, that although there may be good cause why the testimony of a witness to the crime at issue should be proffered, rather than presented live, it is much more difficult to conceive of a good reason for merely proffering the testimony required to establish or interpret relevant past conduct of the accused.

**11.** I agree with the majority that the defendant's right to call witnesses on his or her behalf, *see* D.C.Code 1973, § 23–1322(c)(4), does not include compulsory process directed at

government witnesses unless the defendant proffers how such testimony will tend to negate the probability that he or she committed the offense. *Ante* at 1338. Such a proffer, of course, could undermine the government's effort to show good cause why it should not have to produce its witnesses.

**12.** The majority opinion states that "pretrial detention to prevent repetition of dangerous acts under § 23–1322(a)(1) by incapacitating the detainee seeks to curtail reasonably predictable conduct, not to punish for prior acts." *Ante* at 1332–1333. Later, the majority states: "Significantly, pretrial detention is closely circumscribed so as not to go beyond the need to protect the safety of the community pending the detainee's trial. Such detention is not to exceed 60 days, by which time either the detainee must be brought to trial, or bail must be set. D.C.Code 1973, § 23–1322(d)(2)(A)." *Ante* at 1333. I read the latter statement as a constitutional limitation on the former. Pretrial detention beyond 60 days, without right to bail, arguably takes on the aura of punishment, for, unless the accused asks for a continuance, the government will be hard pressed to justify longer detention on the ground it needs time to prepare for trial.

pretrial detention hearing the government need not bear the burden of proof required for a criminal trial, i. e., proof beyond a reasonable doubt. However, I cannot agree with the majority's implication that a probable cause showing is enough. *See ante* at 1339.

Traditional Fourth Amendment analysis generally stops with the question whether any government intrusion is warranted; it does not focus on how much intrusion the state then can impose. *See Gerstein, supra* 420 U.S. at 125 & nn. 26–27, 95 S.Ct. at 868 & nn. 26–27. Thus, the courts have developed the Fourth Amendment probable cause standard primarily to evaluate what is reasonable conduct for a police officer on the street—an officer who must act quickly on the basis of facts and circumstances available at the time. *See e. g., Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *Crawford v. United States*, D.C.App., 369 A.2d 595, 600–01 (1977); *Arrington v. United States*, D.C. App., 311 A.2d 838, 839 (1973). Probable cause is "a plastic concept" justifying an officer's reasonable conclusion that an arrest and related search are warranted even though, in retrospect, the officer's perceptions may prove incorrect, or another course of action may seem preferable. *Id.*

In reality, therefore, Fourth Amendment probable cause barely can be characterized as a burden of proof at all. Rather, it is a test for reasonable conduct—a standard where "room [is] allowed for the mistakes of reasonable officers when acting on facts which lead to conclusions of probability." *Crawford, supra* 369 A.2d at 600; *see Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).[13]

We accept a relatively high risk of error in a probable cause determination because the intrusion—arrest—is limited. We even accept that high risk of error (discounted by post-arrest information) for the greater pretrial restraint of the imposition of bail. In my judgment, however, before the state can jail someone for two months without even a right to bail, the Fifth Amendment compels much greater accuracy. The injustice of a mere probable cause standard for 60-day pretrial detention is sharply reflected by the fact that this is the same standard required for the *preliminary* hearing and detention of alleged parole and probation violators who—by virtue of a criminal conviction—stand to lose only conditional liberty. *See Gagnon, supra* 411 U.S. at 781–82, 93 S.Ct. at 1759–60; *Morrissey, supra* 408 U.S. at 480, 485, 487, 92 S.Ct. at 2599, 2602, 2603. The final decision on revocation of this conditional liberty can come only after the alleged violator has had an opportunity for a second hearing, which "must be the basis *for more the determining probable cause* ; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Id.* at

---

**13.** The facts of *Arrington, supra*, demonstrate how low the threshold for probable cause can be. This court held the police officer had probable cause to make an arrest for theft based on the following facts:

1. He had seen appellant in an open, public, walk-in, reception room in the Old Senate Office Building. Appellant was standing in the area behind the receptionist's desk, bending over and "looking down behind the desk or the area under the desk."
2. He had seen appellant leave the room, walking at a normal pace.
3. He had examined the room after appellant left and determined that everything appeared normal and particularly that nothing on or behind the desk had been disturbed.

4. He had inquired of people in the adjoining offices whether they knew of a "colored man, or a messenger" in the reception room; these people had indicated they had no knowledge of such a person.
5. He had asked appellant what he was doing in the office; appellant had said, "[N]othing."
6. He had *not* received any report that a crime had been committed or that any property was missing. [*Id.* 311 A.2d at 840 (emphasis in original).]

It is inconceivable to me that the state constitutionally could detain an individual in prison, without right to bail, for up to 60 days on facts as inconclusive as these.

488, 92 S.Ct. at 2603 (emphasis added).[14] In contrast, a potential pretrial detainee stands to lose presumptively unconditional liberty because of criminal charges yet to be proved. This substantially greater liberty interest requires substantially greater protection.

I would hold that the burden of proof for all findings under § 23–1322(b)(2) is greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. In so holding, I would rely on the approach in *Addington, supra,* where the Supreme Court held that clear and convincing evidence is sufficient for imposing involuntary civil commitment. *Id.* 441 U.S. at 431–33, 99 S.Ct. at 1812–13. The Court reasoned that although only "punitive" (criminal) proceedings demand proof beyond a reasonable doubt, *id.* at 427–31, 99 S.Ct. at 1810–12 the risk of erroneous involuntary civil commitment is significant enough, and its consequences severe enough, to require more than a preponderance standard. *Id.* at 425–27, 99 S.Ct. at 1809–10. Weighing the liberty and public interests at stake, I believe that the risk and consequences of erroneous pretrial detention are similarly grave and thus mandate a similar standard of proof.

In adopting a clear and convincing evidence standard, the Court in *Addington* was less concerned with precise wording than with its message to the factfinder "that the proof must be greater than the preponderance of the evidence standard applicable to other categories of civil cases." *Id.* at 433, 99 S.Ct. at 1813. In adopting standards for pretrial detention, Congress has taken a similar approach. Thus, the government must show by "clear and convincing evidence" that the accused is a person subject to pretrial detention under D.C.Code 1973, § 23–1322(a). *Id.* § 23–1322(b)(2)(A). The government also must demonstrate "a substantial probability" that the accused "committed the offense." *Id.* § 23–1322(b)(2)(C).[15] The statute is silent on the degree of evidentiary support required for the most elusive, and thus critical, factual findings, namely those evaluating the "present and past conduct" necessary to sustain a prediction that pretrial detention is necessary to assure community safety. *See id.* § 23–1322(b)(2)(B). We implicitly have construed the statute, however, to require "clear and convincing evidence" for all findings. *See Blunt v. United States,* D.C.App., 322 A.2d 579, 586 (1974); D.C. Code 1973, § 23–1322(b)(2)(A). I would make that ruling explicit here.

I conclude, accordingly, that the pretrial detention statute satisfies due process because—and only because—it requires the government to meet a heavy burden of proof, "clear and convincing evidence," which falls between a preponderance of the evidence and proof beyond a reasonable doubt.[16]

### D. Conclusion as to Due Process

Having compared the private and public interests at stake, evaluated the risk of

---

**14.** The Supreme court has outlined the "minimum requirements of due process" for parole revocation:

> They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. [*Morrissey, supra* at 489, 92 S.Ct. at 2604.]

**15.** The standard is equivalent to the threshold of probability required "to secure a civil injunction—likelihood of success on the merits." H.R.Rep.No. 91–907, 91st Cong., 2d Sess. 182 (1970).

**16.** Although proffered testimony can contribute toward establishing clear and convincing evidence, there may be occasions when a trial court concludes that live testimony will be required, subject to cross-examination, if the government is to sustain this burden of proof.

error, and considered the corrective value of additional safeguards, I conclude that D.C. Code 1973, § 23–1322 can survive constitutional scrutiny by the trial court's strict enforcement of specified defense rights to notice, confrontation, and cross-examination and by the imposition of a burden on the government to prove each statutory requirement by clear and convincing evidence. In failing to make clear that these requirements are inherent in a constitutional pretrial detention scheme, my colleagues in the majority implicitly have compromised the Fifth Amendment right to due process of law.

## IV

Applying these requirements of due process, I dissent from the reversal in the rape case, No. 80–294, and thus would affirm Judge Bowers' order denying the government's first application for detention. I concur, however, in the result reached in the burglary case, No. 80–401, affirming Judge Norman's detention order.

In the rape case, No. 80–294, the government did not satisfy the notice and confrontation requirements. It failed to inform appellant in a specific and timely manner about the "past and present conduct" on which it intended to rely. The government, moreover, proffered the victim's testimony without substantiating its claim that she would be harmed if she were to appear and testify at the hearing. Thus, the government did not satisfy the "good cause" exception to the defense right of confrontation. Accordingly, the trial court properly refused to order pretrial detention.

The burglary case, No. 80–401, is different; appellant's right to notice of "past and present conduct" was satisfied. In the hearing before Judge Norman, the court relied on appellant's confession to the burglary and rape and to 17 other recent robberies; on corroboration by testimony of investigating officers; and on eight adjudications of delinquency in appellant's juvenile social file. Defense counsel received a copy of the confession one-half hour before the hearing; counsel had attended the lineup soon after the arrest at which numerous robbery victims had identified appellant; and, knowing that prior convictions were relevant under the statute, counsel had received access to appellant's juvenile social file at the earlier hearing before Judge Bowers. Under these circumstances, although formal notice may have been lacking in some respects, any error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); D.C.Code 1973, § 11–721(e).

Furthermore, the government's mode of proof in the burglary case did not prejudice appellant's confrontation and cross-examination rights. The government relied on appellant's confession, testimony by investigating officers, and the delinquency adjudications in appellant's social file. The trial court excluded hearsay of the complaining witness. Although the court admitted the hearsay of two victims of the 17 other robberies to which appellant had confessed, that error also was harmless. *See Chapman, supra* at 24, 87 S.Ct. at 828; D.C.Code 1973, § 11–721(e).

Finally, in accordance with the statutory standards, the court found "substantial probability" that appellant had committed the charged offense of burglary; found that that offense is a "dangerous crime"; and found "by clear and convincing evidence" that appellant was a person subject to pretrial detention and that "no condition or combination of conditions of release ... will reasonably assure the safety of other persons and the community." The evidence viewed in the light most favorable to the government supports the court's conclusions.

## V.

I believe Chief Judge NEWMAN's opinion for the court does an exceptional job of sorting out from a myriad of historical documents and scholarly works the meaning of

the Eighth Amendment clause prohibiting excessive bail. I agree that the Eight Amendment does not bar pretrial detention without bail. At the same time, I cannot accept how easily the majority moves from this conclusion to an apparent conclusion that the state constitutionally can detain an individual for 60 days, without right to bail, on the slim basis of "probable cause" to believe that the individual committed a crime and is too dangerous to remain at large pending trial. Given the much stricter standards in the pretrial detention statute itself, the majority's approach is unnecessary and mischievous. It undermines the statute and the Fifth Amendment.

## APPENDIX

D.C.Code 1973, § 23–1321, provides in part:

(a) Any person charged with an offense, other than an offense punishable by death, shall, at his appearance before a judicial officer, be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the judicial officer, unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required or the safety of any other person or the community. When such a determination is made, the judicial officer shall, either in lieu of or in addition to the above methods of release, impose the first of the following conditions of release which will reasonably assure the appearance of the person for trial or the safety of any other person or the community, or, if no single condition gives that assurance, any combination of the following conditions:

(1) Place the person in the custody of a designated person or organization agreeing to supervise him.

(2) Place restrictions on the travel, association, or place of abode of the person during the period of release.

(3) Require the execution of an appearance bond in a specified amount and the deposit in the registry of the court, in cash or other security as directed, of a sum not to exceed 10 per centum of the amount of the bond, such deposit to be returned upon the performance of the conditions of release.

(4) Require the execution of a bail bond with sufficient solvent sureties, or the deposit of cash in lieu thereof.

(5) Impose any other condition, including a condition requiring that the person return to custody after specified hours of release for employment or other limited purposes.

No financial condition may be imposed to assure the safety of any other person or the community.

(b) In determining which conditions of release, if any, will reasonably assure the appearance of a person as required or the safety of any other person or the community, the judicial officer shall, on the basis of available information, take into account such matters as the nature and circumstances of the offense charged, the weight of the evidence against such person, his family ties, employment, financial resources, character and mental conditions, past conduct, length of residence in the community, record of convictions, and any record of appearance at court proceedings, flight to avoid prosecution, or failure to appear at court proceedings.

D.C. Code 1973, § 23–1322 provides in full:

(a) Subject to the provisions of this section, a judicial officer may order pretrial detention of—

(1) a person charged with a dangerous crime, as defined in section 23–1331(3), if the Government certifies by motion that based on such person's pattern of behavior consisting of his past and present conduct, and on the other factors set out in section 23–1321(b), there is no condition

or combination of conditions which will reasonably assure the safety of the community;

(2) a person charged with a crime of violence, as defined in section 23-1331(4), if (i) the person has been convicted of a crime of violence within the ten-year period immediately preceding the alleged crime of violence for which he is presently charged; or (ii) the crime of violence was allegedly committed while the person was, with respect to another crime of violence on bail or other release or on probation, parole, or mandatory release pending completion of a sentence; or

(3) a person charged with any offense if such person, for the purpose of obstructing or attempting to obstruct justice, threatens, injures, intimidates, or attempts or threaten, injure, or intimidate any prospective witness or juror.

(b) No person described in subsection (a) of this section shall be ordered detained unless the judicial officer—

(1) holds a pretrial detention hearing in accordance with the provisions of subsection (c) of this section;

(2) finds—

(A) that there is clear and convincing evidence that the person is a person described in paragraph (1), (2), or (3) of subsection (a) of this section;

(B) that—

(i) in the case of a person described only in paragraph (1) of subsection (a), based on such person's pattern of behavior consisting of his past and present conduct, and on the other factors set out in section 23-1321(b), or

(ii) in the case of a person described in paragraph (2) or (3) of such subsection, based on the factors set out in section 23-1321(b),

there is no condition or combination of conditions of release which will reasonably assure the safety of any other person or the community; and

(C) that, except with respect to a person described in paragraph (3) of subsection (a) of this section, on the basis of information presented by proffer or otherwise to the judicial officer there is a substantial probability that the person committed the offense for which he is present before the judicial officer; and

(3) issues an order of detention accompanied by written findings of fact and the reasons for its entry.

(c) The following procedures shall apply to pretrial detention hearings held pursuant to this section:

(1) Whenever the person is before a judicial officer, the hearing may be initiated on oral motion of the United States attorney.

(2) Whenever the person has been released pursuant to section 23-1321 and it subsequently appears that such person may be subject to pretrial detention, the United States attorney may initiate a pretrial detention hearing by ex parte written motion. Upon such motion the judicial officer may issue a warrant for the arrest of the person and if such person is outside the District of Columbia, he shall be brought before a judicial officer in the district where he is arrested and shall then be transferred to the District of Columbia for proceedings in accordance with the section.

(3) The pretrial detention hearing shall be held immediately upon the person being brought before the judicial officer for such hearing unless the person or the United States attorney moves for a continuance. A continuance granted on motion of the person shall not exceed five calendar days, unless there are extenuating circumstances. A continuance on motion of the United States attorney shall be granted upon good cause shown and shall not exceed three calendar days. The person may be detained pending the hearing.

(4) The person shall be entitled to representation by counsel and shall be entitled to present information by proffer or

otherwise, to testify, and to present witnesses in his own behalf.

(5) Information stated in, or offered in connection with, any order entered pursuant to this section need not conform to the rules pertaining to the admissibility of evidence in a court of law.

(6) Testimony of the person given during the hearing shall not be admissible on the issue of guilt in any other judicial proceedings under sections 23–1327, 23–1328, and 23–1329, in perjury proceedings, and for the purposes of impeachment in any subsequent proceedings.

(7) Appeals from orders of detention may be taken pursuant to section 23–1324.

(d) The following shall be applicable to persons detained pursuant to this section:

(1) The case of such person shall be placed on an expedited calendar and, consistent with the sound administration of justice, his trial shall be given priority.

(2) Such person shall be treated in accordance with section 23–1321—

(A) upon the expiration of sixty calendar days, unless the trial is in progress or the trial has been delayed at the request of the person other than by the filing of timely motions (excluding motions for continuances); or

(B) whenever a judicial officer finds that a subsequent event has eliminated the basis for such detention.

(3) The person shall be deemed detained pursuant to section 23–1325 if he is convicted.

(e) The judicial officer may detain for a period not to exceed five calendar days a person who comes before him for a bail determination charged with any offense, if it appears that such person is presently on probation, parole, or mandatory release pending completion of sentence for any offense under State or federal law and that such person may flee or pose a danger to any other person or the community if released. During the five-day period, the United States attorney or the Corporation Counsel for the District of Columbia shall notify the appropriate State or Federal probation or parole officials. If such officials fail or decline to take the person into custody during such period, the person shall be treated in accordance with section 23–1321, unless he is subject to detention under this section. If the person is subsequently convicted of the offense charged, he shall receive credit toward service of sentence for the time he was detained pursuant to this subsection.

D.C. Code 1973, § 23–1331 provides in part:

As used in this subchapter:

\*　　\*　　\*　　\*　　\*　　\*

(3) The term "dangerous crime" means (A) taking or attempting to take property from another by force or threat of force, (B) unlawfully entering or attempting to enter any premises adapted for overnight accommodation of persons or for carrying on business with the intent to commit an offense therein, (C) arson or attempted arson of any premises adaptable for overnight accommodation of persons or for carrying on business, (D) forcible rape, or assault with intent to commit forcible rape, or (E) unlawful sale or distribution of a narcotic or depressant or stimulant drug (as defined by any Act of Congress) if the offense is punishable by imprisonment for more than one year.

(4) The term "crime of violence" means murder, forcible rape, carnal knowledge of a female under the age of sixteen, taking or attempting to take immoral, improper, or indecent liberties with a child under the age of sixteen years, mayhem, kidnaping, robbery, burglary, voluntary manslaughter, extortion or blackmail accompanied by threats of violence, arson, assault with intent to commit any offense, assault with a dangerous weapon, or an at-

tempt or conspiracy to commit any of the foregoing offenses as defined by any act of Congress or any State law, if the offense is punishable by imprisonment for more than one year.

---

MACK, Associate Judge, dissenting:

## I.

The majority treads where wise men have feared to tread.[1] I am certain that my Brother Newman is not ruling out liberty as a "basic human right." Yet, this case is as much about the constitutional right to liberty as it is about the constitutional right to bail. Ironically enough, my concern is not with the constitutional rights of Marvin L. Edwards, who has entered pleas of guilty in both cases, and who is no longer being held under the detention statute he challenges. My concern is with *MY* constitutional rights for I, like millions of Americans have lived, for a time at least, believing that the United States Constitution prohibited my punishment for a crime until such time as I have been found guilty of committing that crime.[2] And in the interest of giving equal time to Professor Foote[3] (with whom the majority opinion takes issue) "there is a value in unrealized ideals and to close that gap between ideal and reality by abandoning the ideal is not a course lightly to be undertaken."[4]

Idealism aside, however, in my view the majority's analysis of the scope of the Eighth Amendment does not pass muster. The reasoning is not clinical—nor could it be. The conclusion is reached that the Eighth Amendment in commanding that "Excessive bail shall not be required ..."

means only that, and does not grant a right to bail. I presume that the majority is saying that only the Congress can grant a right to bail, and once that right has been granted, the Constitution takes over and mandates that the bail not be excessive. This is a classic example of the cart pulling the horse since the Congress could abrogate the right to bail altogether, making the Eighth Amendment absolutely meaningless. Surely the framers of our Bill of Rights did not intend to fashion illusory protection— leaving open the possibility that a subsequent act of a legislature could empty a *critical* provision of the federal Constitution of all content.

> This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424 (1895). Unless this right to bail before trial is preserved, the presumption of innocence, *secured only after centuries of struggle*, would lose its meaning. [*Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951) (emphasis supplied).]

The fact that the right to bail has been mandated by federal statute (since the passage of the Judiciary Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 81, *as amended*, Rev. Stat. §§ 751–53 (1875)) has little bearing, if any, on the question of whether, in this case at least, it is constitutionally mandated. My colleagues' position, carried to its logical conclusion, could conceivably vest in the District of Columbia City Council the power to deny the right to bail to any citizen

---

1. The United States Supreme Court, for whatever reason, has left unresolved, for over a century and a half, any question of whether the Bill of Rights confers a right to bail.

2. The presumption of innocence is "constitutionally rooted." *Cool v. United States*, 409 U.S. 100, 104, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972). "[A] presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156

U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895). *See also Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 1870, 60 L.Ed.2d 447 (1979); *Campbell v. McGruder*, 188 U.S.App.D.C. 258, 268, 580 F.2d 521, 531 (1978).

3. *See* Foote, *The Coming Constitutional Crisis in Bail*, 113 U. of Pa.L.Rev. 959 (1965).

4. *Ibid.* at 964.

arrested and charged with an offense in this city.[5] (This is not to suggest, of course, that the Council would exercise such power.)

By the majority's own account, the history of the Eighth Amendment is generally unilluminating. Yet, having solemnly pronounced this fact, the majority launches into an in-depth discussion of English and American colonial history (well-known and well-used by many commentators)[6] and proceeds to draw its own inferences therefrom. I suggest that the majority's inferences are no more sound than those of commentators who have reached an opposite conclusion. *See* Foote, *The Coming Constitutional Crisis in Bail*, 113 U. of Pa.L. Rev. 959 (1965), who has argued that specific language with respect to the right to bail was inadvertently omitted from the draft of the Amendment.

The central theme of the majority's historical analysis appears to be that, in England, Parliament was free to define which crimes were bailable. It follows, therefore, that the framers of the United States Constitution would place no restraints whatever on the Congress in this regard. The language of the Eighth Amendment speaks of "excessive bail" in language almost identical to the English Bill of Rights which was directed toward judicial abuse. Therefore, our Bill of Rights in addressing bail, imposes merely a restraint on the courts.

I suggest that the majority's approach is much too parochial. Its focus on precedent is solely to the identity of language and it ignores altogether the important aspect of

motivation. History fails as a meaningful tool of legal interpretation and becomes merely a recitation of facts unless it can be presumed that individuals learn from it. It is "well known that our Bill of Rights was written and adopted to guarantee Americans greater freedom than had been enjoyed by their ancestors who had been driven from Europe by persecution." *Carlson v. Landon*, 342 U.S. 524, 557, 72 S.Ct. 525, 542, 96 L.Ed. 547 (1952) (Black, J., dissenting) *citing Bridges v. California*, 314 U.S. 252, 264–65, 62 S.Ct. 190, 194–95, 86 L.Ed. 192 (1941).

In focusing narrowly on the language and purpose of the English Bill of Rights, the majority does a disservice to history and its meaning. The true purpose of the English Bill of Rights of 1689 (1 W & M st. 2, c.2) cannot be discerned without resort to an understanding of the purposes of other developments in the 17th Century—the Habeas Corpus Act of 1677 (31 Charles 1, c.2) and the Petition of Right of 1628 (3 Charles 1, c.1). Each one of these developments represented merely one step at a time to remedy a specific problem at hand, in light of a bigger struggle growing out of centuries of abuses by man against man—in unjustly detaining or corruptly extracting money for liberty—conduct engaged in by local custodians, justices, and monarchs alike. *See* Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb.L.Rev. 33 (1977). If, therefore, we are to rely on English history, let us go back to the Statute of Westminister the First 1275[7] and more basically to the 29th Chapter of the Magna Carta (1215) providing that:

---

**5.** At the time when the American states were ratifying the United States Constitution, debates centered around the necessity for a federal Bill of Rights. In North Carolina, it was suggested that incorporation of such a bill would prove detrimental to liberty since it would be impossible to enumerate all the individual rights not relinquished by the Constitution, and the omission of some rights would raise the question of their existence. A compromise suggested what one commentator has speculated might have given form to the Ninth Amendment—a clause in the federal Constitution guaranteeing that all rights not surren-

dered to the central government would be reserved to the states. *See* Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb.L.Rev. 33, 83 (1977).

**6.** Foote, *supra*; Duker, *supra*; Meyer, *Constitutionality of Pretrial Detention*, 60 Geo.L.J. 1139 (1972); Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 Va.L.Rev. 371 (1970).

**7.** 3 Ed. 1, c.15.

No Freeman shall be taken or imprisoned, or disseised of his Freehold, or Liberties, or free Customs, or to be outlawed, or any otherwise destroyed, but by lawful Judgment of his Peers, or by the law of the Land. [9 Hen. 3, c.29.]

Further, the majority, with its emphasis on Parliament, does not make allowances for the differences between the English system of absolute Parliamentary control over individual rights and the basic American system of a government of limited and defined powers delegated by the people and circumscribed by enumerated individual liberties. *See* Black, *The Bill of Rights*, 35 N.Y.U.L.Rev. 865 (1960). James Madison spoke to this contrast in proposing the Bill of Rights to Congress (1 Annals of Cong. 18, 46–50 (Gales & Seaton ed. 1789–1791)).

> In the declaration of rights which that country has established, the truth is, they have gone no further than to raise a barrier against the power of the Crown; the power to legislate is left altogether indefinite . . . . But although . . . it may not be thought necessary to provide limits for the legislative power in that country, yet a different opinion prevails in the United States. The people of many states have thought it necessary to raise barriers against power in all forms and departments of government.

In this framework, viewed against the backdrop of centuries of struggles against unlawful detention, it seems somehow ludicrous to me to suggest that the Eighth Amendment was drafted with the idea of isolating Congress from its restraints. I cannot believe that the framers of the Bill of Rights were more preoccupied with an English form of government than with a guarantee of liberty. Moreover, it appears to me even more ludicrous to suggest that pretrial detention is not punishment within the meaning of the Bill of Rights. Historically speaking, such detention was the ma-

jor reason for the development of the right to bail. One would have been hard pressed, in 1626, to have had the duty of explaining to Sir Thomas Darnel and four other knights, that they were not being punished when they were committed "by special command of his majesty" (for refusing to pay illegal assessments) and held without trial after the Attorney General, prevailing against an argument for release on bail, suggested that the "King's position was best for balancing the interest of society and the individual." Duker, *supra* at 58–59.

In this country, until recently, there was little doubt that the Eighth Amendment, by necessary implication, guaranteed the right to bail before trial, except in capital cases. Our own Judge Holtzoff, as late as 1960, stated this emphatically and added:

> The right to bail pending trial is absolute, except in capital cases,[8] no matter how vicious the offense or how unsavory the past record of the defendant may be. [*Trimble v. Stone*, 187 F.Supp. 483, 485 (D.D.C.1960).]

*See also United States v. Motlow*, 10 F.2d 657, 659 (7th Cir. 1926).

Perhaps the reluctance of my colleagues to follow this traditional view of the Eighth Amendment's mandate stems from the phrasing of the claimed right in "absolute" terms. There is very little in the world in which we live that is absolute. Yet because the Constitution was written for the ages, judges must resist the temptation to interpret it restrictively, in the expediency of the moment, with the problems of their life span in mind. Perhaps a better solution for the majority would have been to suggest as did Justice Burton that the Eighth Amendment prohibits, along with excessive bail, the "unreasonable denial of bail." *See Carlson v. Landon, supra* 342 U.S. at 569, 72 S.Ct. at 548. The legislative scheme here at issue then could have been evaluated as to reasonableness.

---

**8.** The capital crimes exception predates the Constitution and is found consistently in colonial provisions for the right to bail. As Chief

Judge Newman points out, this exception stems from the fear that persons facing the death penalty will be tempted to flee.

I am most receptive to the suggestion that the Constitution is a living document; yet I am not embarrassed to say that it borders on a sacred one. If we are tempted to believe that it is necessary that we resolve an ambiguity therein, I would opt for the interpretation that not only makes common sense but that is the very essence of the Bill of Rights—the preservation of individual liberty.

## II.

The statute which is the subject of this litigation is a "one-of-a-kind" law, applying only to the District of Columbia. Its provisions, imaginatively drafted in 1970 by good lawyers who "apparently ... tried to protect the Act against attack on constitutional grounds," [9] represent a response to what was thought to be a crisis stemming from crime in the streets. In succumbing to the seductive appeal of sanctioning these provisions designed to prevent crime through detention, the majority of this court follows the example of the Queen immortalized in literature and described by a distinguished commentator [10] as follows:

> Witness this classic exchange in Lewis Carroll's *Through The Looking Glass* [88 Harper & Bros. ed. 1902]. The Queen observes that the King's Messenger is "in prison now, being punished; and the trial doesn't even begin till next Wednesday; and of course the crime comes last of all." Perplexed, Alice asks, "Suppose he never commits the crime?" "That would be all the better, wouldn't it?" The Queen replies.

The majority recognizes that the government has conceded, as it must [11] that if preventive detention is punishment, it cannot be imposed, constitutionally, absent conviction for the crimes charged (with certain exceptions not here relevant).[12] The majority then follows a tortured analysis designed to show that this statute, which sanctions detention for 60 days prior to trial without benefit of bail, is regulatory [13] rather than penal in character and therefore does not punish. I suggest that today's arrestee, detained under the aegis of protecting the community, would be no less surprised, than would have Sir Thomas Darnel, to know he was not being punished "in a legal sense": in fact he would be more apt to surmise that he was not being *legally* punished. "[P]retrial detention itself [is] indistinguishable from punishment ...." *Campbell v. McGruder,* 188 U.S.App.D.C. 258, 267, 580 F.2d 521, 530 (1978). A person detained prior to trial is deprived of the right to free association, *Papachristou v. Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and the right to travel, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The "privacy and integrity" of his family is threatened. *See Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). In addition, pretrial detention handicaps a defendant in the preparation of a defense. *Barker v. Wingo,* 407 U.S. 514, 533, 92 S.Ct. 2182, 2193, 33

**9.** *See* Meyer, *supra* at 1169.

**10.** *See* Tribe, *supra* at 374.

**11.** Under the Due Process Clause, detainees may not be punished prior to an adjudication of guilt in accordance with due process of law. *Bell v. Wolfish, supra* 99 S.Ct. at 1872; *Ingraham v. Wright,* 430 U.S. 651, 671–72 n.40, 674, 97 S.Ct. 1401, 1412–13 n.40, 1414, 51 L.Ed.2d 711 (1977).

**12.** There is no dispute here that pretrial detention to prevent flight or the intimidation of witnesses is constitutionally permissible. The practice of denying bail in capital offenses, predating the Constitution, was based upon the premise that one so charged is more likely to flee.

**13.** The constitutional challenge in *Bell v. Wolfish, supra,* was to prison security practices, clearly regulatory in nature, as applied to pretrial detainees, concededly legitimately incarcerated to insure presence at trial. Here we are concerned with the constitutionality of the initial decision to detain.

L.Ed.2d 101 (1972); *Stack v. Boyle, supra.* Moreover, there is persuasive authority suggesting that pretrial detention affects the outcome of a case. *See Preventive Detention: An Empirical Analysis*, 6 Harv. Civ. Rights—Civ. Lib. L. Rev. 289, 347 (1971). *See also Kinney v. Lenon*, 447 F.2d 596 (9th Cir. 1971).

The sanction of the instant statute, measured by the traditional tests which the majority recognizes as pertinent to drawing distinctions between penal and regulatory sanctions, is indisputably penal. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 6 L.Ed.2d 644 (1963). It imposes an affirmative restraint—the loss of liberty—which has historically been regarded as punishment; it comes into play on a finding of scienter; and in seeking deterrence, it promotes the traditional aim of punishment. Moreover, as I point out subsequently, it bears little rational connection to the assigned "alternative purpose" of protecting the community and it appears excessive in relation to that alternative purpose.

Specifically, under D.C. Code 1973, § 23–1322(a)(1), a judicial officer may order pretrial detention of a person charged with a "dangerous crime"[14] where the government certifies that the pattern of behavior "consisting of his past and present conduct" indicates that no condition or combination of conditions reasonably assures the safety of the community.

A hearing is required at which the standards of proof are "clear and convincing evidence" as to the pattern of behavior and a "substantial probability" that the person committed the offense for which he is before the judicial officer.

This statutory scheme must be assessed in light of undisputed principles. Where the state seeks to limit a fundamental right it may do so only upon a showing of a "compelling state interest." *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Further, the scheme must be "necessary" for, and "not merely rationally related" to the effectuation of that interest. *McLaughlin v. Florida*, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964). Finally, there must be no less restrictive means of promoting that interest. *NAACP v. Alabama*, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964). One cannot question that the right to liberty is a fundamental right or that the state has a compelling interest in curtailing street crime. One can and does question whether the statute in question promotes the compelling state interest and whether it does so in a manner least restrictive of the fundamental right.

Underlying the statutory classification of "dangerous" persons is a presumption that the state can predict those persons who are dangerous. I have reviewed defense counsel's exhaustive treatment of this presumption and I am convinced by the authorities relied upon that the presumption is not a valid one. Moreover, I am likewise convinced that the utilization of this presumption for the asserted purpose will result in pretrial detention of persons who pose no threat to the community. In my view, therefore, this classification of "dangerousness" is arbitrary and invalid under due process and equal protection principles. *Estate of French v. Doyle*, D.C.App., 365 A.2d 621, 623 (1976), *dismissed sub nom. Key v. Doyle*, 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977), *reh. den.*, 434 U.S. 1025, 98 S.Ct. 753, 54 L.Ed.2d 773 (1978).

Without dwelling at length on the sources relied upon by defense counsel, it is interesting to note that at congressional hearings on the legislation, experts both in and out of government expressed concern with the ability of the authorities to predict dan-

---

14. Interestingly enough, the term "dangerous crime" includes offenses ranging from attempted burglary, or distribution of narcotics, to forcible rape. It does not include such dangerous offenses as murder and kidnapping.

gerousness.[15] These concerns have been echoed in the results of empirical studies.[16]

The American Psychiatric Association has suggested that "[n]either psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness'." [17] The American Bar Associa-

tion, has deemed detention under our statute "constitutionally dubious at best",[18] noting that ten years of experience had demonstrated that the experts' doubts as to the inability to predict dangerousness were well founded.[19] Moreover, the Bar Association has noted that the statute is virtually useless in reducing recidivism.[20]

15. Thus Ms. Patricia Wald, formerly of the Department of Justice and now a Judge of the United States Court of Appeals for the District of Columbia Circuit, stated that

despite the fact that preventive detention has been talked about for years, we have as yet no empirical study, no predictable study, which shows the factors which go into recidivis[m] on bail and which the judge could use in order to single out one man in 10 who might commit the crime. [Proposed District of Columbia Omnibus Crime Bill: Hearings on S. 2601 Before the Senate Committee on the District of Columbia, 91st Cong., 2d Sess. 2153 (1970).]

Former Chief Judge Harold Greene of the Superior Court, now Judge of the United States District Court for the District of Columbia, also testified as to the anticipated over-inclusiveness of the proposed legislation:

Statistics indicate that future criminal behavior is not easily predictable. Eight, ten, or perhaps even more suspects who would not commit crimes while out on bail would have to be detained in order to be sure to keep off the streets the one defendant who will. It is perhaps for that reason that preventive detention has been outside the mainstream of Anglo-American jurisprudence from Magna Carta to the present day. [Proposed District of Columbia Omnibus Crime Bill: Hearings on S. 2601 Before the Senate Committee on the Judiciary, 91st Cong., 1st Sess. 31 (1969).]

16. The American Bar Endowment sponsored a Harvard study of the rearrest rate of persons in the Boston area during a six-month period in 1968. *Preventive Detention: An Empirical Analysis*, 6 Harv. Civ. Rights—Civ. Lib. L. Rev. 289 (1971). Using the District of Columbia preventive detention statute as a framework, the researchers focused on 427 released defendants charged with violent or dangerous crimes who would have been eligible for preventive detention had the District of Columbia law been in effect in Boston in 1968. *Id.* at 306.

Of the 427 defendants in the sample, 41 were rearrested and convicted of crimes committed during the pretrial period. Twenty-two of the 41 convictions were for violent or dangerous crimes as defined by the act.

The researchers used a "dangerous scale" model which considered the factors set out in

§ 1321(b) with the exception of the weight of the evidence in the instant arrest (the factors set out in § 1321(b) were originally designed to predict default—*i. e.*, flight from prosecution) and incorporated by reference into § 1322(b)(2)(B). They concluded that in order to prevent all 41 offenses it would be necessary to detain 357 persons—that is, for every one recidivist detained eight nonrecidivists would also have to be detained. *Id.* at 314. Such a ratio "amounts to little less than a dragnet." *Id.* at 344.

17. American Psychiatric Association, *Task Force Report on the Clinical Aspects of Violent Individuals* 28 (1974). *See also* Rubin, *Prediction of Dangerousness in Mentally Ill Criminals*, 27 Arch. General Psychiatry 397 (1972) (no empirical evidence to support the belief that psychiatrists can accurately predict dangerous behavior).

18. Commentary to the American Bar Association Standards Relating to Pretrial Release (2d ed. Approved Draft, 1979, following Standard 10-5.9) at 10–106. *See also Millard v. Harris*, 132 U.S.App.D.C. 146, 159, 406 F.2d 964, 977 (1968).

19. ABA Report, *supra* at 10–98.

20. "The chief finding of the first ten months of observation has been the virtual non-use of the preventive detention law." *Id.* at 10–105, *quoting* Vera Institute of Justice, Preventive Detention in the District of Columbia 72–73 (1972). *See also* House Committee on the District of Columbia, H.R. Rep.No. 1419, 94th Cong., 2d Sess. 4 (1976):

[F]rom the date of enactment until [1976], pretrial detention was rarely requested (only about 60 times during the entire 5 year period.) Various explanations were given for such non-use, but nearly all agree that the 1970 Act's detention provisions have been a complete failure as a tool for dealing with the hard core group of repeat offenders. [Footnote omitted.]

In a like vein (although Mr. Edwards is hardly in a position to challenge this),[21] the language of § 23–1322 poses serious problems with respect to unconstitutional vagueness. Nowhere in the statute is "past and present conduct" defined. Neither does the statute define the "safety" of the community.

The process, for reviewing a statute for vagueness, is to determine whether it is sufficiently explicit to inform those who are subject to it what conduct will render them liable to its penalties or whether it is so vague that men of common intelligence must necessarily guess at its meaning. *See Willcher. v. United States,* D.C.App., 408 A.2d 67 (1979). A statute fails to meet the requirements of the Due Process Clause if it leaves the trier-of-fact free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. *Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). In this regard, definitional uncertainty becomes an open invitation to virtually unrestrained administration. *Ricks v. District of Columbia,* 134 U.S.App.D.C. 201, 414 F.2d 1097 (1968).

This statute, by failing to specify what types of past or future conduct may be considered in assessing a defendant's dangerousness, opens the way for abuse in administration. I can only conclude that the framers of this legislation recognized this fact. Thus, a Justice Department spokesman, testifying as to the "totality of . . . circumstances" (record, character and attitude) that a trial judge would review in concluding whether a course of conduct would be dangerous to the community, added:

> The court could say that a petty larceny or petty offense was dangerous to the community, the guy was a drunk driver

for example, and this was dangerous to the community. Such a conclusion, however, would be simply unreasonable. I think the conclusion that mari[j]uana smoking is dangerous is unreasonable. *But I don't know of any way to prevent courts from being unreasonable.*

We predicate everything here on the *good faith* of courts and the *good faith* of prosecutors not to allege such information and the *good faith* of courts of appeals to review these matters and be fair in their judgment. [Preventive Detention: Hearings on S. 2600 Before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, 91st Cong., 2d Sess. 314 (1970) (emphasis added).]

The flexibility that accompanies the exercise of discretion is a necessary component of our system of criminal justice. It is a tribute to the reasonableness of our prosecutors and our courts that the instant statute is being challenged for the first time. But the restraints embodied in the Bill of Rights were not codified under the illusion that man would always be reasonable and would always act in good faith. As the United States Court of Appeals so aptly noted in striking as unconstitutionally vague the District's general vagrancy statute (D.C.Code 1967, §§ 22–3302 to –3306):

> [A] criminal statute perishes on constitutional grounds when it leaves speculative the tests for ascertaining the line separating guilty from innocent acts. [*Ricks v. District of Columbia, supra* 134 U.S.App. D.C. at 205, 414 F.2d at 1100.]

> And not even past violation of the criminal law authorizes one's subjection to innately vague statutory specifications of crime. [*Id.* at 214, 414 F.2d at 1110 (footnote omitted).]

I would hold this statute unconstitutional as violative of both substantive and proce-

---

**21.** A determination of vagueness is not made in a vacuum but rather is made with regard to the facts of the case at hand. *Willcher v. United States,* D.C.App., 408 A.2d 67 (1979); *see United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). In light of appel-

lant's extensive prior criminal activity and juvenile record it cannot be concluded that he was without notice that this specific past conduct did not bring him within the scope of the pretrial detention statute.

dural[22] due process and I would look to more feasible and less restrictive alternatives for combating pretrial crime. [Defense counsel has suggested use and enforcement of stringent pretrial release conditions, with prosecution for violation and revocation of release in cases of noncompliance; expedited proceedings for persons deemed likely to commit crime while on bail; and extensive filing of "release papers" which enhance penalties for offenses committed by persons on pretrial release. *See also* American Bar Association Standards Relating to Pretrial Release, *supra* Standard 10–5.9 which characterize a defendant as a danger to the community *if* he has "(b)(ii)(A) ... committed a criminal offense since release, or ... (B) violated conditions of release designed to protect the community and no additional conditions of release are sufficient to protect the safety of the community ...."]

I would affirm the order of Judge Bowers denying the government's application for pretrial detention and reverse the order of Judge Norman granting pretrial detention.[23]

---

**22.** I concur in the reasoning of Judge Ferren to the extent that he finds procedural deficiencies in the scheme of the statute.

**23.** I do not reach the issue involving closure of trial.